Jeff P. Prostok
State Bar No. 16352500
Lynda L. Lankford
State Bar No. 11935020
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Ft. Worth, TX  76102
Telephone: (817) 877-8855
Facsimile:  (817) 877-4151
jprostok@forsheyprostok.com
llankford@forsheyprostok.com

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| In re: | ) CHAPTER 11 CASES |
| INSTAPAY FLEXIBLE, LLC, | ) CASE NO. 21-42214-11 |
| FLEXIBLE FUNDING LTD. LIABILITY CO., | ) CASE NO. 21-42215-11 |
| DEBTORS. | ) **Joint Administration Pending** |
| | ) **Emergency Hearing Requested** |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS AUTHORIZING THE USE OF CASH
COLLATERAL AND GRANTING ADEQUATE PROTECTION**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COME NOW Instapay Flexible, LLC ("Instapay") and Flexible Funding Ltd. Liability Co. ("Flexible", and with Instapay, the "Debtors" or the "Companies"), as debtors and debtors in possession, and pursuant to Bankruptcy Rule 4001(b), file *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Use of Cash Collateral and Granting Adequate Protection* (the "Motion").  In support of the Motion, the Debtors respectfully state as follows:

**PRELIMINARY STATEMENT**

1. The Debtors seek emergency relief to use cash collateral in the operation of their businesses.  The Debtors operate as asset-based lenders and factors for approximately 400

active borrower accounts, primarily in the staffing and transportation industries. The Debtors have an urgent need to continue to fund borrower accounts on a daily basis. Even a few days' interruption in funding could be detrimental for the Debtors' borrowers. The Debtors estimate that some 20,000 employees are employed by the Debtors' borrowers in the staffing industry that depend on routine funding to pay payroll and other operating costs. The Debtors' trucking clients depend on daily funding to cover transportation costs to continue operations and to get their truckers back home after deliveries.

2. The relief requested is critical to the Debtors' operations and to the operations of their borrowers. Moreover, the continued use of cash collateral will preserve the Debtors' operations and the value of their assets to the collective benefit of all creditors and parties in interest.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This case and all related matters have been referred to this Court pursuant to 28 U.S.C. § 157. This Motion constitutes a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (D), (M) and (O). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4. On September 19, 2021 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

5. The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or committee has been appointed in these cases.

6. Concurrently herewith, the Debtors are filing a Motion for Joint Administration of their cases.

## ABOUT THE COMPANY

7.  The Debtors are privately held asset based lending ("ABL") and factoring companies, primarily focused on the staffing and transportation industries. Instapay is a wholly-owned subsidiary of Flexible. Instapay engages in factoring for clients in the transportation industry, while Flexible focuses on ABL, mainly for the staffing industry.

8.  Flexible's ABL product enables its clients to fund and grow their businesses using the accounts receivable (AR) that they receive from their customers. Flexible ordinarily makes revolving loans to its clients based on the value of their AR, less a reserve. Typical client terms provide for an 85-90% advance rate against AR. Flexible refers to its clients' customers as "end debtors", as ultimately Flexible is relying on the end debtor to make timely payments on the AR owed to Flexible's clients. To ensure repayment, Flexible's clients agree to have their customers pay Flexible directly through its lockbox account. Flexible applies those payments to the outstanding loan from its clients, reducing the loan balance. Clients regularly request advances from Flexible and Flexible receives requests for advances daily from its clients. Flexible collects payments daily from end debtors which reduce client loan balances and provides clients with availability for operating financing. Flexible charges fees and interest to its clients based on the amount borrowed.

9.  Similarly, Instapay also funds its clients based on their AR and collects from the clients' end debtors. Instapay, however, does not make revolving loans, but rather engages in true factoring, in which Instapay actually acquires the AR from its clients and becomes the owner of that AR. Instapay charges an up-front fee to factor a receivable – usually 3%, and advances the rest. Instapay clients are in the trucking industry. Instapay receives requests to purchase its clients' accounts receivable daily, and receives payments on purchased accounts receivable daily. Funds received from purchased accounts receivable are applied to clients' outstanding availability to provide them daily liquidity.

10. The Debtors employ a staff that includes portfolio management, sales, and operations. The Debtors' workforce assists clients with funding requests, verifies the legitimacy of clients' AR, tracks end debtors to ensure payments are made in a timely fashion, maintains the Company's proprietary software system, engages in sales and marketing activities to find new clients, and manages the Company's relationship and borrowings with its own lender group. Flexible and Instapay currently have between 600-700 combined clients, approximately 400 of which are currently active, with a total portfolio of about $110 million in loans and factored receivables.

## PARTIES WITH INTEREST IN CASH COLLATERAL

**A.    UMPQUA CREDIT FACILITY**

11. The Debtors are borrowers pursuant to that certain Credit Agreement dated as of December 19, 2019 (as amended, the "Umpqua Credit Agreement"), by and among, *inter alia*, the Debtors, Umpqua Bank, as administrative agent, and Umpqua Bank, CIT Bank, N.A. (as successor by merger to Mutual of Omaha Bank), and Horizon Bank, as lenders (collectively, the "Umpqua Lenders"). The Umpqua Credit Agreement provides the Debtors with a $100 million revolving line of credit pursuant to the terms of the Umpqua Credit Agreement (the "Umpqua Credit Facility").

12. The obligations under the Umpqua Credit Facility are secured by a blanket lien in all assets of the Debtors as provided in the Umpqua Credit Agreement and related loan documents (the "Umpqua Prepetition Collateral"), including all accounts and proceeds thereof. Pursuant to intercreditor agreements between the Umpqua Lenders and Bison and Medalist (as such terms are defined hereafter), Umpqua holds a first lien in the Umpqua Prepetition Collateral. The Umpqua Prepetition Collateral includes the Debtors' cash and cash equivalents ("Cash Collateral") as of the Petition Date.

13. As of the Petition Date, the Debtors were indebted to the Umpqua Lenders in the

approximate amount of $78,204,000. As of the Petition Date, the Debtors estimate that the amount recoverable on their loan portfolio is approximately $108,774,813. This provides the Umpqua Lenders with a substantial equity cushion based on accounts alone.

**B.    BISON NOTE**

14.    Flexible is obligated to Bison Investors, LLC ("Bison") pursuant to that certain Secured Promissory Note in the principal amount of $2,000,000 dated May 2, 2019 (the "Bison Note"). The Bison Note is secured by a blanket lien in Flexibile's assets (the "Bison Prepetition Collateral"), including an asserted interest in Flexible's Cash Collateral. As noted above, Bison's security interest in the Bison Prepetition Collateral is subordinated to the security interests of the Umpqua Lenders in those assets pursuant to an intercreditor agreement.

15.    As of the Petition Date, Flexible was indebted to Bison pursuant to the Bison Note in the approximate amount of $2,000,000.

**C.    MEDALIST OBLIGATION**

16.    Flexible is obligated as borrower to Medalist Partners Opportunity Master fund II-A, L.P. ("Medalist") pursuant to that certain Subordinated Financing Agreement dated as of September 27, 2019, which provides Flexible with a line of credit in the maximum amount of $20,000,000 (the "Medalist Facility"). Instapay has guaranteed Flexible's obligations under the Medalist Facility. Both Flexible's obligations to Medalist under the Medalist Facility and Instapay's obligations under its guaranty agreement are secured by a blanket lien in the Debtors' assets (the "Medalist Prepetition Collateral"), including an asserted interest in Cash Collateral. Medalist's security interest in the Medalist Prepetition Collateral is subordinated to the security interests of the Umpqua Lenders in those assets pursuant to an intercreditor agreement.

17.    As of the Petition Date, the Debtors were indebted to Medalist in the approximate amount of $15,700,000.

## RELIEF REQUESTED

18. Pursuant to this Motion and section 363(c) of the Bankruptcy Code, the Debtors seek interim and final orders authorizing the use of Cash Collateral. The Debtors request authority to use Cash Collateral in accordance with the Budget attached hereto as **Exhibit A** (the "Budget") on an interim basis, and in accordance with subsequent budgets hereafter approved by the Court on a final basis.

19. Pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Debtors seek to grant adequate protection through the issuance of replacement liens to the Umpqua Lenders, Bison and Medalist (the "Lenders") in the assets comprising their Prepetition Collateral (a) to the extent of the value of each of their security interest in the Prepetition Collateral, and (b) in the same order of priority as presently existing in the Prepetition Collateral, for any diminution in value of their individual security interests in the Prepetition Collateral as of the Petition Date as a result of the use of Cash Collateral and the imposition of the automatic stay. In addition, as provided in the Budget, the Debtors seek to provide additional adequate protection to the Lenders through the payment of post-petition interest on the secured obligations at the non-default rate of interest.

20. The relief requested herein is necessary to prevent immediate and irreparable harm to the Debtors' chapter 11 estates and should provide sufficient funds to permit the Companies to continue to operate their businesses, to provide funding for their clients, and to satisfy payroll and other direct operating expenses. The Debtors request approval for interim use of Cash Collateral through the week of October 1, 2021 on an interim basis (the "Interim Order") and thereafter on a permanent basis (the "Final Order").

## BASIS FOR RELIEF

21. The Debtors estimate that the total of their secured obligations to the Lenders as of the Petition Date is approximately $95,904,000, and that the amount recoverable on their

loan portfolio is approximately $108,774,813. The Debtors anticipate that their loan portfolio will retain is value during the bankruptcy case through continued operations. Thus, each of the Lenders are adequately protected by equity in their Prepetition Collateral. Nevertheless, to the extent of any diminution in value of each Lender's security interest in their Prepetition Collateral occasioned by the use of Cash Collateral, the Debtors propose to grant the Lenders replacement liens in such assets in the same order of priority as presently existing in the Prepetition Collateral. In addition, the Debtors propose to continue to pay post-petition interest to each of the Lenders at the non-default rate of interest. In doing so, the Debtors will provide further adequate protection to such Lenders, and will preserve the value of the Debtors' assets for the benefit of all other creditors.

22. The Debtors assert that the relief requested in this Motion will provide the Lenders with adequate protection for the use of Cash Collateral. The Debtors' continued use of Cash Collateral for operations will continue the going concern value of the Debtors' businesses and will maximize the position of all of the Debtors' creditors, including the Lenders. In the course of operations, the Debtors will continue to fund borrower clients and generate and collect new receivables. Such ongoing operations benefit the Lenders and all other creditors in that new accounts receivable will be created by the use of Cash Collateral.

23. The Companies have no material source of ongoing income other than from operations, including the extension of new loans and factoring arrangements and the collection of accounts receivable. At the present time, an immediate and critical need exists for the Debtors to be permitted access to funds in order to continue the operation of their businesses, to continue to fund borrower accounts, to pay employees and other operating expenses, and to protect their ability to reorganize in accordance with chapter 11 of the Bankruptcy Code.

24. Pursuant to section 363(c)(2)(B) of the Bankruptcy Code, the Debtors request that the Court authorize and approve the Debtors' use of Cash Collateral for the payment of

operating expenses in accordance with the Budget and with subsequently approved budgets. To remain in possession of their property, to continue their business activities, and to achieve a successful reorganization, the Debtors request use of Cash Collateral in the Debtors' ordinary business operations. The Debtors believe that payment of operating expenses in accordance with the Budget is reasonable and that such payment is for necessary business expenses that must be paid in order to continue the Debtors' business operations.

25. In the event the Court does not authorize the Debtors' proposed use of Cash Collateral, the Debtors believe that the Debtors will be unable to maintain their current business operations and to confirm a plan of reorganization as contemplated by the Bankruptcy Code. Without the use of Cash Collateral, the Debtors will be seriously and irreparably harmed, resulting in significant losses to the Debtors' estates and their creditors.

## APPLICABLE AUTHORITY

26. One of the Debtors' most pressing concerns is the need for immediate use of Cash Collateral pending a final hearing on this Motion. Rule 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. *See* Fed.R.Bankr.P. 4001(b) and (c); 11 U.S.C. 363. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the restricted use of cash collateral to the extent necessary to avoid immediate and irreparable damage to the Debtors' estates. The Debtors require use of Cash Collateral to fund borrower accounts, pay present operating expenses, including payroll, and to pay vendors to ensure a continued operations essential to the Debtors' continued viability.

27. The Debtors request immediate authority to use the Cash Collateral to fund the Debtors' day-to-day operations. Absent such relief, the Debtors will not be able to continue to

operate their businesses. In sum, failure to obtain authorization for the use of the Cash Collateral will be disastrous to the Debtors and their creditors. Entry of an order authorizing the use of Cash Collateral will minimize disruption to the Debtors' business and operations and permit the Debtors to fund borrower accounts and meet payroll and other operating expenses. Absent use of the Cash Collateral, the Debtors' estates would not have sufficient funds to satisfy ongoing business obligations. Allowing use of Cash Collateral, therefore, is in the best interest of the Debtors' estates and each of their creditors.

28. The use of Cash Collateral and the adequate protection proposed herein is fair and reasonable under the circumstances and reflects the Debtors' exercise of prudent business judgment. Also, the adequate protection proposed herein in the form of replacement liens and payment of post-petition interest, in addition to existing liens in the Prepetition Collateral, is sufficient to protect the interests of the Lenders.

### **LIMITED NOTICE**

29. Notice of this Motion will be provided to the office of the United States Trustee for the Northern District of Texas, the Debtors' prepetition secured lenders, the holders of the twenty (20) largest unsecured claims against the Debtors, and parties filing a notice of appearance, as set forth in the Certificate of Service filed herewith. Under the Bankruptcy Code, the Bankruptcy Rules, and the N.D. Tex. L.B.R., the Debtors submit that no other further notice need be provided.

### **CONCLUSION**

30. The relief requested herein should ensure that the Debtors' chapter 11 estates have sufficient resources to commence their chapter 11 cases and to provide a seamless transition to operating the Debtors' business as debtors-in-possession. The Debtors request that the Court grant the Motion.

WHEREFORE, the Debtors respectfully request that the Court (i) grant the Motion; (ii)

.

enter an Interim Order permitting the Debtors to use Cash Collateral consistent with the Budget; (iii) after a final hearing on this Motion, enter a Final Order permitting the Debtors to use Cash Collateral on a final basis as provided herein; (iv) grant the Lenders adequate protection as provided herein; and (v) grant all such other and further relief as is just and proper.

Dated: September 20, 2021

Respectfully submitted,

/s/ Jeff P. Prostok
Jeff P. Prostok
State Bar No. 16352500
Lynda L. Lankford
State Bar No. 11935020
FORSHEY & PROSTOK, L.L.P.
777 Main Street, Suite 1290
Fort Worth, Texas 76102
Phone: (817) 877-8855
Fax: (817) 877-4151

PROPOSED COUNSEL
FOR THE DEBTORS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon the office of the United States Trustee for the Northern District of Texas, the secured lenders, the holders of the twenty (20) largest unsecured claims against the Debtors, and parties filing a notice of appearance, via ECF electronic Notice, if available, on September 20, 2021 and via United States Mail, first class postage prepaid on September 20, 2021.

/s/ Lynda L. Lankford
Lynda L. Lankford

L:\JPROSTOK\Flexible Funding (C11) #6264\Pleadings\Motion to Use Cash Collateral 9.16.21.docx

# Exhibit "A"

**Cash Flow Forecast**

| | Week Ending: | 1<br>9/10/2021 | 2<br>9/17/2021 | 3<br>9/24/2021 | 4<br>10/1/2021 | 4-Week Total |
|---|---|---|---|---|---|---|
| A/R Collections | | $22,738,599 | $22,738,599 | $22,738,599 | $22,738,599 | **$90,954,395** |
| **Total Receipts** | | **$22,738,599** | **$22,738,599** | **$22,738,599** | **$22,738,599** | **$90,954,395** |
| | | | | | | |
| Fundings to Clients | | $21,005,191 | $21,196,148 | $21,387,104 | $21,578,060 | **$85,166,503** |
| **Total Fundings** | | **$21,005,191** | **$21,196,148** | **$21,387,104** | **$21,578,060** | **$85,166,503** |
| | | | | | | |
| **Net Receipts Before Operating Costs** | | **$1,733,407** | **$1,542,451** | **$1,351,495** | **$1,160,539** | **$5,787,892** |
| | | | | | | |
| **Operating Costs** | | | | | | |
| Bank and transaction fees | | $6,954 | $6,954 | $6,954 | $6,954 | **$27,814** |
| Credit Reports | | - | - | - | 15,968 | **15,968** |
| Marketing & Promotion (Commissions) | | - | 71,625 | - | - | **71,625** |
| Occupancy | | - | 700 | - | 13,320 | **14,020** |
| Office and administration | | 2,900 | 2,900 | 2,900 | 2,900 | **11,602** |
| Outside Services | | - | - | - | 35,464 | **35,464** |
| Personnel | | 89,246 | 89,246 | 89,246 | 89,246 | **356,982** |
| Legal & Professional | | - | - | - | 100,000 | **100,000** |
| Software | | 6,108 | 6,108 | 6,108 | 6,108 | **24,432** |
| Taxes and permits | | 4,001 | 4,001 | 4,001 | 4,001 | **16,004** |
| Travel | | 3,500 | 3,500 | 3,500 | 3,500 | **14,000** |
| ABL Interest Expense | | 60,157 | 60,157 | 60,157 | 60,157 | **240,628** |
| Secured Sub Debt Interest Expense | | 40,077 | 40,077 | 40,077 | 40,077 | **160,308** |
| **Total Operating Costs** | | **$212,942** | **$285,268** | **$212,942** | **$377,695** | **$1,088,847** |
| | | | | | | |
| **Total BK & Other Costs** | | | | | | |
| Retention Agreements | | - | - | - | - | **-** |
| **Total BK & Other** | | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Weekly Cash Flow** | | **$1,520,465** | **$1,257,184** | **$1,138,553** | **$782,844** | **$4,699,045** |
| | | | | | | |
| **Rolling Cash Balance** | | | | | | |
| Beginning Cash | | - | $1,520,465 | $2,777,649 | $3,916,201 | **-** |
| Weekly Cash Flow | | 1,520,465 | 1,257,184 | 1,138,553 | 782,844 | 4,699,045 |
| **Week Ending Cash Balance** | | **$1,520,465** | **$2,777,649** | **$3,916,201** | **$4,699,045** | **$4,699,045** |