



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 8, 2021**

*Mark X. Mullin*

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FLEXIBLE FUNDING LTD. LIABILITY CO., | § | |
| *et al.,* | § | Case No. 21-42215-11-mxm |
| | § | |
| Debtors. | § | |
| | § | (Jointly Administered) |

**ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF
DEBTOR FLEXIBLE FUNDING LTD. LIABILITY CO.'S ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER
INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN
<u>CONNECTION THEREWITH; AND (C) GRANTING RELATED RELIEF</u>**

Upon consideration of the motion (the "<u>Motion</u>")[1] [Docket No. 73] of Flexible Funding

Ltd. Liability Co. ("<u>Flexible</u>") and InstaPay Flexible LLC ("<u>InstaPay</u>") (collectively, the

---

[1] Unless otherwise stated, all capitalized terms not defined herein shall have the same meaning as set forth in the Motion.

"<u>Debtors</u>") for entry of an order, among other things: (a) establishing Bidding Procedures to sell substantially all of Flexible's assets; (b) scheduling an Auction to sell such assets; (c) scheduling the Sale Hearing; (d) scheduling deadlines for Flexible's receipt of a marked asset purchase agreement; (e) approving the notice of the Sale, the Bidding Procedures, the Auction and the Sale Hearing; (f) establishing procedures for determining Cure Amounts in connection with the assumption and assignment of the Assigned Contracts; and (g) granting other related relief; and it appearing that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion and opportunity for objection having been given, with no objections or requests for hearing having been filed; and it appearing that no other or further notice need be given; and after due deliberation and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS THAT:**[2]

**<u>Jurisdiction, Final Order and Statutory Predicates</u>**

A.    This Court has jurisdiction over the Motion pursuant to 28 U.S C. § 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). Venue is proper in this District and in this Court pursuant to 28 US.C. §§ 1408 and 1409.

B.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7054, this Court expressly finds that

---

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

        C.      The statutory predicates for the relief requested herein are sections 105(a), 363(b), (f) and (m), and 365 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002(a)(2), 6004(a), (b), (c), (e), and (f), 6006(a), (c) and (d), 9006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

<u>**Compliance with Bidding Procedures Order**</u>

        D.      On October 15, 2021, the Court entered the *Order (A) Approving Bidding Procedures in Connection with the Sale of Substantially All of Debtor Flexible Funding Ltd. Liability Co.'s Assets, (B) Approving the Form and Manner of the Sale Notice, (C) Scheduling an Auction and Sale Hearing, (D) Scheduling Certain Deadlines, and (E) Approving Procedures for Determining Cure Amounts* [Docket No. 110] (the "<u>Bidding Procedures Order</u>"). Pursuant to the Bidding Procedures Order, the Court approved the Bidding Procedures and granted related relief in connection with a prospective sale of substantially all of Flexible's assets.

        E.      On or about September 29, 2021, eCapital Corp. or its nominee ("<u>eCapital</u>") executed a letter of intent ("<u>LOI</u>") to acquire the assets of Flexible and become the stalking horse bidder for a sale of such assets pursuant to section 363 of the Bankruptcy Code. A true and correct copy of the LOI was introduced at the bid procedures hearing as Debtors' Exhibit 16.

        F.      In the Bidding Procedures Order, the Court established a deadline of 5:00 p.m. prevailing Central Time, October 25, 2021, by which eCapital and Flexible must execute and file with the Court an asset purchase agreement for the purchase and sale of substantially all of Flexible's assets, in order for eCapital to be considered the stalking horse bidder for such assets. Flexible and eCapital Commercial Finance Corp. and its affiliates, as the nominee of eCapital ("<u>eCapital Commercial</u>"), did in fact execute and file with the Court

such an asset purchase agreement by such deadline. Therefore, in accordance with the Bidding Procedures Order, eCapital Commercial is the stalking horse bidder for such assets.

G.    In addition to the stalking horse bid submitted by eCapital, a Qualifying Bid was timely submitted by the following party: Encore Funding II, LLC ("Encore", and collectively with eCapital, the "Qualifying Bidders").

H.    On November 5, 2021, the Debtors conducted the Auction in accordance with the terms of the Bidding Procedures Order. Subsequent to the Auction, the Debtors determined that eCapital Factoring (Holding) Corp., an affiliate of eCapital Commercial (the "Purchaser") had submitted the highest and best offer for Flexible's assets. Such offer has been memorialized in an Asset Purchase Agreement (the "APA") for the purchase and sale of assets identified in the APA (the "Purchased Assets"), including certain executory contracts identified in the APA (the "Assigned Contracts"). The Purchased Assets comprise substantially all of Flexible's assets. The Purchaser and Flexible executed the APA on or about November 1, 2021. A true and correct copy of the APA is attached hereto as **Exhibit A**.

I.    Subsequent to the Auction, the Debtors determined that Encore (the "Back-up Bidder") had submitted the next highest or otherwise next best offer for Flexible's assets and qualifies as the Back-up Bidder pursuant to the terms of the Bidding Procedures.  Such offer has been memorialized in an Asset Purchase Agreement, executed on or about November 2, 2021 (as modified on the record at the Auction, the "Back-up Bidder APA") for the purchase and sale of assets identified in the Back-up Bidder APA.

<u>**Adequacy of Notice**</u>

J.    Actual written notice of the Sale Hearing, the Auction, the Motion, the Sale, and the assumption and assignment of the Assigned Contracts, and a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein, have been afforded to all known interested persons and entities, including, but not limited to

the following parties: (a) the United States Trustee; (b) counsel to Umpqua Bank; (c) Bison Investors, LLC or its counsel; (d) counsel to Medalist Partners Opportunity Master Fund II-A, L.P.; (e) all taxing authorities having jurisdiction over any of the Purchased Assets, including the Internal Revenue Service; (f) the United States Department of Justice; (g) all parties that have requested special notice pursuant to Bankruptcy Rule 2002; (h) all persons known or reasonably believed to have asserted a Lien on any of the Purchased Assets; (i) the counterparties to each of the Assigned Contracts (the "Contract Counterparties"); (j) all persons known or reasonably believed to have expressed an interest in acquiring the Purchased Assets; and (k) counsel to eCapital.

K.      In accordance with the provisions of the Bidding Procedures Order, the Debtors have served notice upon the Contract Counterparties: (i) that the Debtors seek to assume and assign certain executory contracts and unexpired leases on the Closing Date; and (ii) of the relevant cure amounts. The service of such notice was good, sufficient and appropriate under the circumstances, and no further notice need be given in respect of establishing a cure amount for the Assigned Contracts. Each of the Contract Counterparties has had an adequate opportunity to object to the cure amounts set forth in the notice.

L.      The Sale Notice provided all interested parties with timely and proper notice of the Sale, the Sale Hearing, and the Auction.

M.      As evidenced by the certificates of service previously filed with this Court, proper, timely, adequate, and sufficient notice of the Motion, the Auction, the Sale Hearing, and the Sale has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014. The Debtors also have complied with all obligations to provide notice of the Motion, the Auction, the Sale Hearing, and the Sale required by the Bidding Procedures Order. The notices described above were good, sufficient, and appropriate under the circumstances, and no other or

further notice of the Motion, the Auction, the Sale Hearing, the Sale, or the assumption and assignment of the Assigned Contracts is required.

 N. The disclosures made by the Debtors concerning the APA, the Auction, the Sale, the Sale Hearing, and the assumption and assignment of the Assigned Contracts were good, complete, and adequate.

## Good Faith of the Purchaser

 O. The Purchaser is not an "insider" of either of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

 P. The Purchaser is purchasing the Purchased Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*: (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets; (ii) the Purchaser complied with the provisions in the Bidding Procedures Order; (iii) the Purchaser agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale have been disclosed; (v) the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (vi) no common identity of directors or controlling equity holders exists between the Purchaser and either of the Debtors; and (vii) the negotiation and execution of the APA was at arms' length and in good faith.

## Highest and Best Offer

 Q. The Debtors conducted the Auction in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order. The auction process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Purchased Assets. The

Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner, and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Purchased Assets.

R.      The APA constitutes the highest and best offer for the Purchased Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the APA constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

S.      The APA represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of these chapter 11 cases. No other person or entity or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtors' estates than the Purchaser.

T.      Approval of the Motion and the APA as set forth in this Order and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

U.      The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to and outside of a plan of reorganization.

### No Fraudulent Transfer

V.      The consideration provided by the Purchaser pursuant to the APA is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

W.      The Purchaser is not a mere continuation of the Debtors or their estates and there is no continuity between the Purchaser and the Debtors. The Purchaser is not holding itself out to the public as a continuation of the Debtors. The Purchaser is not a successor to

the Debtors or their estates, and the Sale does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors.

## Validity of Transfer

X.      The Debtors have full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, and no further consents or approvals are required for the Debtors to consummate the transactions contemplated by the APA, except as otherwise set forth in the APA.

Y.      The transfer of each of the Purchased Assets to the Purchaser will be as of the Closing Date a legal, valid, and effective transfer of such assets, and vests or will vest the Purchaser with all right, title, and interest of the Debtors in and to the Purchased Assets free and clear of all Encumbrances accruing, arising or relating thereto at any time prior to the Closing Date, except for any assumed liabilities (the "Assumed Liabilities") under the APA.

## Section 363(f) is Satisfied

Z.      The Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereby if the sale of the Purchased Assets to the Purchaser, and the assumption, assignment, and sale of the Assigned Contracts to the Purchaser, were not free and clear of all Encumbrances of any kind or nature whatsoever (except the Assumed Liabilities), or if the Purchaser would or in the future could be liable for any of such Encumbrances.

AA.     The Debtors may sell the Purchased Assets free and clear of all Encumbrances against the Debtors, their estates or any of the Purchased Assets (except for the Assumed Liabilities) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Encumbrances against the Debtors, their estates or any of the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have

consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of

such Encumbrances who did object fall within one or more of the other subsections of

section 363(f) and are adequately protected by having their Encumbrances, if any, in each

instance against the Debtors, their estates or any of the Purchased Assets, attach to the

cash proceeds of the Sale ultimately attributable to the Purchased Assets in which such

creditor alleges an interest, in the same order of priority, with the same validity, force and

effect that such creditor had prior to the Sale, subject to any claims and defenses the

Debtors and their estates may possess with respect thereto.

### Assumption and Assignment of the Assigned Contracts

BB.     The assumption and assignment of the Assigned Contracts pursuant to the

terms of this Order is integral to the APA and is in the best interests of the Debtors and their

estates, creditors, and other parties in interest. The Debtors' decision to assume and assign

the Assigned Contracts to the Purchaser upon the terms and conditions set forth in the APA

and this Order constitutes a reasonable exercise of sound and prudent business judgment

by the Debtors.

CC.     The respective amounts set forth on **Exhibit B** annexed hereto are the sole

amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy

Code to cure all monetary defaults and pay all actual pecuniary losses under the Assigned

Contracts (the "Cure Amounts").

DD.     Pursuant to the terms of the APA, on or before the Closing Date, the

Purchaser shall have: (i) cured and/or provided adequate assurance of cure of any

monetary default existing prior to the Closing Date under any of the Assigned Contracts,

within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; (ii) provided

compensation or adequate assurance of compensation to any party for actual pecuniary

loss to such party resulting from a default prior to the Closing Date under any of the

Assigned Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code; and

(iii) provided adequate assurance of its future performance under the relevant Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable), and 365(f)(2)(B) of the Bankruptcy Code.

## Compelling Circumstances for an Immediate Sale

EE.     To maximize the value of the Purchased Assets and preserve the viability of the business to which the Purchased Assets relate, it is essential that the Sale of the Purchased Assets occur within the time constraints set forth in the APA. Time is of the essence in consummating the Sale.

FF.     Good cause exists for shortening notice of the Motion and the Sale pursuant to Bankruptcy Rules 2002(a)(2) and 9006(c)(1), and no party in interest has shown any prejudice resulting from such shortening of notice.

GG.     Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the purchase price under the APA, the proposed Sale of the Purchased Assets to the Purchaser constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

HH.     The consummation of the transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the transaction.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

## General Provisions

1.     The relief requested in the Motion is granted and approved, and the Sale contemplated thereby and by the APA is approved as set forth in this Order.

2.     This Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order are incorporated herein by reference.

3.     All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to this Court at the Sale Hearing or by stipulation filed with this Court, and all reservations of rights included therein, are hereby overruled on the merits.

## Approval of the APA

4.     The APA and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved.

5.     Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale of the Purchased Assets to the Purchaser pursuant to and in accordance with the terms and conditions of the APA, (b) close the Sale as contemplated in the APA and this Order, and (c) execute and deliver, perform under, consummate, implement and close fully the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and the Sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the APA and such other ancillary documents.

6.     This Order shall be binding in all respects upon the Debtors, their estates, all creditors, all holders of equity interests in any Debtor, all holders of any Claim(s) (whether known or unknown) against any Debtor, any holders of Encumbrances against or on all or any portion of the Purchased Assets, all Contract Counterparties, the Purchaser and all successors and assigns of the Purchaser, and any trustees, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' cases. This Order and the APA shall inure to the benefit of the Debtors, their estates and creditors, the Purchaser and their respective successors and assigns.

**Transfer of the Purchased Assets**

7.        Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Purchased Assets on the Closing Date. The Purchased Assets shall be transferred to the Purchaser "as is, where is, and with all faults" in accordance with the APA upon and as of the Closing Date. Such transfer shall constitute a legal, valid, binding, and effective transfer of such Purchased Assets and, upon the Debtors' receipt of the Purchase Price, shall be free and clear of all Encumbrances except any Assumed Liabilities. Upon the Closing, the Purchaser shall take title to and possession of the Purchased Assets subject only to any Assumed Liabilities. Pursuant to section 363(f) of the Bankruptcy Code, the transfer of title to the Purchased Assets, including but not limited to the Assigned Contracts, shall be free and clear of (a) any and all Encumbrances except for Assumed Liabilities; and (b) any and all Claims including, without limitation, any and all claims pursuant to any successor or successor-in-interest liability theory; *provided, however,* that the Purchaser shall not be relieved of liability with respect to the Assumed Liabilities. All Encumbrances shall attach solely to the proceeds of the Sale with the same validity, priority, force, and effect that they now have as against the Purchased Assets, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

8.        Except as expressly permitted or otherwise specifically provided by the APA or this Order, all persons and entities holding Encumbrances or interests in all or any portion of the Purchased Assets (other than the Assumed Liabilities) arising under or out of, in connection with, or in any way relating to the Debtors, the Purchased Assets, the operation of the Debtors' business prior to the Closing Date or the transfer of the Purchased Assets to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser or its successors or assigns, their property or the Purchased Assets, such persons' or entities' Encumbrances in and to the Purchased

Assets. On the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be necessary to release Encumbrances on the Purchased Assets, if any, as provided for herein, as such Encumbrances may have been recorded or may otherwise exist. The transactions authorized herein shall be of full force and effect, regardless of any Debtor's lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business. Upon consummation of the transactions set forth in the APA, the Purchaser shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect, or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to this Order under section 363 and the related provisions of the Bankruptcy Code.

9. All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Purchased Assets to the Purchaser in accordance with the terms of the APA and this Order.

10. All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Purchaser or its assignee at the Closing.

11. A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any of the Encumbrances of record.

12. If any person or entity that has filed statements or other documents or agreements evidencing Encumbrances on, interests in, all or any portion of the Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to the Purchaser for the purpose of' documenting the release of all Encumbrances, which the

person or entity has or may assert with respect to all or any portion of the Purchased Assets, the Debtors are hereby authorized and directed, and the Purchaser is hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

14. 13. This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

## Assigned Contracts

14. The Debtors are authorized and directed to assume and assign each of the Assigned Contracts to the Purchaser free and clear of all Encumbrances, as described herein. The payment of the applicable Cure Amounts (if any) by the Purchaser shall (a) effect a cure of all defaults existing thereunder as of the Closing Date and (b) compensate for any actual pecuniary loss to such Contract Counterparty resulting from such default. The Purchaser shall then have assumed the Assigned Contracts and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assigned Contracts shall not be a default thereunder. After the payment of the relevant Cure Amounts by the Purchaser, neither the Debtors nor the Purchaser shall have any further liabilities to the Contract Counterparties other than the Purchaser's obligations under the Assigned Contracts that accrue and become due and payable on or after the Closing Date.

15. Any provision in any Assigned Contract that purports to prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Contract, constitutes an unenforceable anti-assignment provision that is void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser of the Assigned Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtors under the Assigned Contracts.

16. Upon the Closing and the Purchaser's payment of the relevant Cure Amounts, if any, the Purchaser shall be deemed to be substituted for the Debtors as a party to the applicable Assigned Contracts, and the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts.

17. Upon the payment of the applicable Cure Amount, if any, the Assigned Contracts will remain in full force and effect, and no default shall exist under the Assigned Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

18. The Purchaser has provided adequate assurance of future performance under the relevant Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable), and 365(f)(2)(B) of the Bankruptcy Code.

19. There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Purchaser or the Debtors as a result of the assumption and assignment of the Assigned Contracts.

20. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all Contract Counterparties are forever barred and permanently enjoined from raising or

asserting against the Debtors or the Purchaser any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts existing as of the Closing Date or arising by reason of the Closing.

### Back-up Bidder APA

21. If the Purchaser fails to Close on the Sale of the Purchased Assets as provided in the APA, then (1) the sale to the Back-up Bidder pursuant to the terms of the Back-up Bidder APA is hereby approved, (2) all findings of fact, conclusions of law and decretal provisions made herein with respect to the Purchaser and the APA shall apply with the same force and effect to the Back-up Bidder and Back-up Bidder APA, respectively, and (3) a true and correct copy of the Back-up Bidder APA shall be filed with this Court no later than twelve (12) hours prior to the Closing of the sale of the Purchased Assets to the Back-up Bidder.

### Sale Proceeds

22. Upon the Closing of the sale of the Purchased Assets pursuant to the APA, the actual amount of the "Gross Cash Proceeds Available at Close" (as such term is used in Debtors' Exhibit 13 admitted at the Sale Hearing, the "Waterfall Analysis") shall be determined at Closing and shall be disbursed as follows: (a) the full amount of Principal, Interest, the State UCC Termination Fee, the Recording Fee, and fees for the Field Exam Completed May 2021 (as such terms are used in Agent's Exhibit 1 admitted at the Sale Hearing, the "Payoff Statement"), plus daily interest from the date of the Payoff Statement to the date of Closing, if any, as provided in the Payoff Statement, shall be disbursed at Closing to the Agent on behalf of the Lenders to be applied to the Pre-Petition Indebtedness (as such terms are defined in the *Fourth Interim Order Granting Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Use of Cash Collateral and Granting Adequate Protection* [Docket No. 183] (the "Cash Collateral Order"); (b) $584,786.00 (the "Candlewood Fees") shall be disbursed to Forshey Prostok, LLP to be held in its IOLTA

Account and thereafter paid to Candlewood Partners, LLC upon entry of an order approving the Candlewood Fees; (c) the full amount of the Professional Fees and Additional Contractual Fees (as defined below) shall be deposited in the Blocked Account pending allowance or disallowance of such fees as provided below; and (d) the balance of the actual Gross Cash Proceeds Available at Close shall be disbursed at Closing to the Debtors and shall be subject to the terms of the Cash Collateral Order.

23.     Payment of the professional fees and expenses identified in the Payoff Statement for McGuireWoods LLP and Haynes and Boone, LLP (the "<u>Professional Fees</u>") shall be subject to the terms of paragraph 5 of the Cash Collateral Order, such that a summary invoice of the proposed Professional Fees shall be served upon counsel for the Debtors and the United States Trustee, and such parties shall have a ten (10) day period to request a determination of the reasonableness of the Professional Fees. If no request to determine the reasonableness of the Professionals Fees is filed, the Professional Fees shall be paid from funds deposited in the Blocked Account. If a request to determine reasonableness is filed, the Professional Fees shall be paid from funds deposited in the Blocked Account to the extent allowed pursuant to Court Order.

24.     The Voluntary Reduction Fee, the Unused Line Fee, and costs attributed to Brandlin & Associates (as such terms are used in the Payoff Statement) (the "<u>Additional Contractual Fees</u>") shall be payable from funds deposited in the Blocked Account upon agreement of the Debtors and the Agent or to the extent determined by further Court Order to be allowable by the Pre-Petition Loan Documents (as defined in the Cash Collateral Order), applicable law and applicable Orders of this Court.

25.     Upon Closing and the disbursement of funds as provided herein, (a) the Debtors' obligations to the Agent on behalf of the Lenders, and the Debtors' obligations to Umpqua Bank shall be deemed fully paid and satisfied, except for the payment of the Professional Fees and Additional Contractual Fees to the extent such amounts are

ultimately allowed as provided herein; (b) the Agent on behalf of the Lenders and Umpqua

Bank will hold no security interest in any of the Debtors' assets, including with respect to

cash and cash equivalents, except the cash collateral that shall be deposited in the Blocked

Account pursuant to this Order; and (c) Umpqua Bank, as agent for the first lienholders,

shall be deemed "paid in full" for purposes of the *Order (I) Authorizing and Approving the*

*Debtors' Key Employee Incentive Plan and Key Employee Retention Plan; and (II) Granting*

*Related Relief* [Docket No. 184].

## **Other Provisions**

26.      Effective upon the Closing Date and except as otherwise provided by

stipulations filed with or announced to this Court with respect to a specific matter, all

persons and entities are forever prohibited and permanently enjoined from commencing or

continuing in any manner any action or other proceeding, whether in law or equity, in any

judicial, administrative, arbitral or other proceeding against the Purchaser, its successors

and assigns, or the Purchased Assets, with respect to any (a) Encumbrance arising under,

out of, in connection with or in any way relating to the Debtors, the Purchaser, the

Purchased Assets, or the operation of the Purchased Assets prior to the Closing of the Sale,

or (b) successor liability, including, without limitation, the following actions: (i) commencing

or continuing in any manner any action or other proceeding against the Purchaser, its

successors or assigns, assets or properties; (ii) enforcing, attaching, collecting or recovering

in any manner any judgment, award, decree or order against the Purchaser, its successors,

assets or properties; (iii) creating, perfecting or enforcing any Encumbrance against the

Purchaser, its successors or assigns, assets or properties; (iv) asserting any setoff, right of

subrogation or recoupment of any kind against any obligation due the Purchaser or its

successors or assigns; (v) commencing or continuing any action, in any manner or place,

that does not comply or is inconsistent with the provisions of this Order or other orders of

this Court, or the agreements or actions contemplated or taken in respect thereof; or

(vi) revoking, terminating or failing or refusing to issue or renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets.

27.     Except for the Assumed Liabilities or as otherwise expressly set forth in this Order or the APA, the Purchaser shall not have any liability or other obligation of the Debtors arising under or related to any of the Purchased Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the APA, the Purchaser shall not be liable for any claims against the Debtors or any of its predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Purchased Assets prior to the Closing. The Purchaser has given substantial consideration under the APA for the benefit of the holders of any Encumbrance. The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Purchaser, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Encumbrances against or interests in the Debtors or any of the Purchased Assets.

28.     The transactions contemplated by the APA are undertaken by the Purchaser without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the

assumption and assignment of the Assigned Contracts), unless such authorization and consummation of such Sale are duly stayed pending such appeal. The Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

29.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these chapter 11 cases, (b) any subsequent chapter 7 case into which any such chapter 11 case may be converted, or (c) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the APA or the terms of this Order.

30.     Pursuant to Bankruptcy Rules 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately upon entry, and the Debtors and the Purchaser are authorized to close the Sale immediately upon entry of this Order.

31.     Nothing in this Order or the APA approves or provides for the transfer to the Purchaser of any avoidance claims (whether under chapter 5 of the Bankruptcy Code or otherwise) of the Debtors' estates.

32.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

33.     There are no brokers involved in consummating the Sale, and no brokers' commissions are due.

34.     The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the APA be authorized and approved in its entirety.

35.     The APA and any related agreements, documents or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

36.     This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which either of the Debtors is a party or which has been assigned by the Debtors to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

37.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

38.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern.

39.     To the extent there are any inconsistencies between the terms of this Order and the APA (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

### ### END OF ORDER ###

L:\JPROSTOK\Flexible Funding (C11) #6264\Pleadings\Flexible Sale Motion\Order Approving Sale-Flexible 11.7.21.docx

# EXHIBIT A

# ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**

This Asset Purchase Agreement (the "Agreement"), dated as of November 1, 2021, is made by and between (1) eCapital Factoring (Holding) Corp., a Florida corporation (the "Buyer"), and (2) Flexible Funding Ltd. Liability Co., a California limited liability company (the "Seller").

RECITALS

WHEREAS, the Seller is engaged in the business of providing asset-based loans and invoice factoring services (the "Business");

WHEREAS, the Seller desires to sell and the Buyer desires to purchase the Purchased Assets (as defined below), subject to the terms and conditions of this Agreement;

WHEREAS, on September 19, 2021, Seller and its affiliate filed a petition seeking relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") which is being jointly administered in the chapter 11 bankruptcy case styled *In re: Flexible Funding, Ltd. Liability Co., et al*, Case No. 21-42215-MXM-11 (the "Bankruptcy Case") currently pending in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court");

WHEREAS, the Buyer and the Seller intend to effectuate the transactions contemplated by this Agreement through a sale of the Purchased Assets free and clear of all liens and encumbrances pursuant to sections 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, the Seller's ability to consummate the transactions contemplated by this Agreement is subject to, among other things, the entry of the Sale Order (as defined below).

NOW, THEREFORE, in consideration of the respective covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I.
DEFINITIONS

1.1     Defined Terms.    As used herein, the terms below shall have the following meanings.  Any of such terms, unless the context otherwise requires, may be used in the singular or plural, depending upon the reference.

"Accounts" means all outstanding accounts receivable previously purchased by the Seller pursuant to the Customer Contracts and standing as assets on the Seller's books.

"Account Debtor" means any of those customers of the Business who are party to Customer Contracts.

"Affiliate" of any particular Person shall mean any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by or under common

control with such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Approved ABL Assets" means all asset-based loans owing to the Seller that were originated pursuant to Customer Contracts.

"Approved A/R Assets" means all Receivables related to the Customer Contracts.

"Assumed Contracts" means the Customer Contracts, the Employment Contracts, the IP Contracts and any other contracts listed on the Purchased Assets Schedule attached hereto as Schedule 1.

"Assumed Liabilities" means those liabilities and obligations of performance associated with the Purchased Assets, but only to the extent such liabilities and obligations arise during and pertain to periods after the Effective Time, including, without limitation, those contractual liabilities and obligations of performance first arising after the Effective Time under the express terms of each Assumed Contract, other than any performance obligation arising out of, related to, in the nature of or caused by (a) any default, failure to perform, breach of contract or breach of warranty by the Seller or its Affiliates occurring or arising prior to the Effective Time or (b) liabilities arising as a result of the Seller's consummation of the transactions contemplated by this Agreement.

"Auction" means the process by which competing bids on the Transferred Assets are submitted on the Auction Date as contemplated by the Bidding Procedures.

"Auction Date" means November 5, 2021, or such other date that the Court approves for the Auction.

"Auction Date Certificate" means the certificate as to the Purchase Price delivered by the Seller substantially in the form of Exhibit A-1 attached hereto.

"Bad Debt" means all Accounts that are not collectable solely because the applicable Account Debtor (a) had died or suspended business, (b) had filed or has had filed against it a petition in bankruptcy or an application for relief under any Debtor Relief Laws, or (c) had appointed a trustee, custodian or receiver for any assets of such Account Debtor, or (d) had made an assignment for the benefit of creditors or had become insolvent or was generally to pay its debts (including its payroll) as such debts became due.

"Bidding Procedures" means the procedures governing the submission, evaluation and qualification of competing bids on the Transferred Assets (as hereinafter defined), and the auction among qualified bidders for the purchase of such assets, as described in the Bidding Procedures Order, or as otherwise required or approved by the Bankruptcy Court.

"Bidding Procedures Motion" means a motion filed by the Seller in the Bankruptcy Court seeking approval of the sale process described in the Sale Motion and the Bidding Procedures.

"Bidding Procedures Order" means an order of the Bankruptcy Court approving the sale process described in the Sale Motion and the Bidding Procedures.

"Books and Records" means all books and records of the Seller relating to the Business and the Purchased Assets.

"Closing Payment" means the total amount payable by the Buyer at Closing as specified in the Purchase Price Certificate.

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations thereunder.

"Court Order" means any judgment, writ, consent decree, injunction, determination, ruling or order of any federal, state or local court or governmental authority that is binding on any Person or its property under applicable law.

"Customer Contracts" means those asset-based loan or factoring agreements between the Seller and the customers of the Business specified on the Customer Contracts section of the Purchased Assets Schedule attached hereto as Schedule 1, including, without limitation, any accounts receivable or other sums that may be owed to the Seller thereunder as of the Closing, and any Liens, claims, deposits, prepayments, warranties, causes of action, rights of recovery, set-off or recompense of any kind in connection therewith, and any guarantees of any third parties given in connection therewith.

"Customer Deposits" means those balances, if any, maintained by the Seller in connection with Customer Contracts.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Effective Time" means 12:01 am on the Closing Date (as defined in Section 3.1).

"Escrow Agreement" means that certain Escrow Agreement, to be dated as of the Closing Date, by and among [Forshey Prostok LLP] ("Escrow Agent"), the Buyer and the Seller, in the form agreed by the Buyer, the Seller and the Escrow Agent.

"Excluded Accounts" means all Accounts listed on the Excluded Accounts Schedule attached hereto as Schedule 2.

"Excluded Assets" means:

      (a)     all Excluded Accounts;

      (b)     all cash or cash equivalents of the Seller;

(c) all claims for refunds of Tax and other governmental charges or assessments paid by the Seller or its Affiliates and arising from or pertaining to periods, activities, operations or events relating to the Business occurring prior to the Closing Date; and

(d) all assets of the Seller relating to Instapay Flexible LLC.

"Excluded Liabilities" means any liabilities or obligations of any kind or nature whatsoever of the Seller not expressly included in the Assumed Liabilities. Excluded Liabilities includes, without limitation, the following liabilities and obligations of the Seller, in each case, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due: (i) resulting from, arising out of, relating to, in the nature of, or caused by (A) the Seller's liabilities or obligations under this Agreement and other documents executed in connection herewith, (B) Taxes for taxable periods ending on or prior to the Closing Date, and for any taxable periods beginning before or on and ending after the Closing Date, Taxes for the portions of such taxable periods ending on the Closing Date, (C) any Indebtedness, (D) any Excluded Assets, (E) breach of contract, breach of warranty, tort, infringement, or violation of Law occurring prior to the Effective Time, (F) earned but unpaid compensation of any kind or any employees of the Seller, including paid-time off, commission payments, officer or employee bonuses, profit-sharing plans or payments or other employee benefits, including any severance pay, insurance, supplemental pension, deferred compensation, "stay" or other similar incentive bonuses, change-in-control bonuses or other bonuses or compensation related in any way to the execution, delivery or performance of this Agreement, retirement and any other benefits, (G) any employment, consulting or independent contractor agreement not included in the Assumed Contracts, (H) any benefit plan or arrangement with respect to which the Seller or its Affiliates have any liability, (I) any liabilities or obligations arising or occurring prior to the Effective Time, including with respect to Purchased Assets but specifically excluding the Assumed Liabilities, (J) any Proceedings to which the Seller is or has been a party, (K) any sum owed by the Seller to any Affiliate, officer, director, or shareholder of the Seller or any of their respective Affiliates, (L) any liability arising out of or relating to services provided by the Seller in connection with the Business prior to the Effective Time, (M) any liabilities relating to any insurance adjustments or (N) any other liability, obligation, claim, cost or expenses arising out of facts, events, circumstances, actions or inactions occurring prior to the Effective Time.

"Final Order" means an order of the Bankruptcy Court in the Bankruptcy Case which (a) shall not have been reversed, stayed, modified or amended and with respect to which (i) the time to appeal from or seek review or rehearing of such order shall have expired; and (ii) no motion for rehearing, reconsideration, amendment or new trial is pending; or (b) although subject to appeal, rehearing, reconsideration, amendment, new trial or otherwise subject to review, no stay of the order being appealed from has been obtained, whether by supersedeas bond, collateral security or otherwise.

"Final Notice" means a notice distributed in accordance with the Bidding Procedures regarding the transactions contemplated by this Agreement and the Sale Order.

"Goodwill" means all goodwill associated with the Business and the Purchased Assets, together with the exclusive right to represent to third parties that the Buyer is the successor

to the Business, including, without limitation, the right, at the Buyer's sole discretion, to hire any employees or contractors previously employed by or performing services for the Seller at any time prior to the Effective Time.

"Indebtedness" means (a) any liability or obligation of the Seller created or assumed by the Seller (i) for borrowed money, (ii) evidenced by a bond, note, debenture or similar instrument (including a purchase money obligation, deed of trust or mortgage) given in connection with the acquisition of, or exchange for, any property or assets, (iii) for the payment of money as lessee under leases that should be, in accordance with generally accepted accounting principles, recorded as capital leases for financial reporting purposes, (iv) for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, (v) for the deferred purchase price of property, goods or services (other than trade payables or accruals incurred in the ordinary course of business, but including any deferred purchase price Liabilities, earnouts, contingency payments, installment payments, seller notes, promissory notes, or similar Liabilities, in each case, related to past acquisitions by the Seller and, for the avoidance of doubt, in each case, whether or not contingent), (vi) in respect of deferred compensation for services, or (vii) under interest rate or currency swap transactions (valued at the termination value thereof); (b) any liability or obligation described in the preceding clause (a) of any other Person that is guaranteed as to payment of principal or interest by the Seller or in effect guaranteed by the Seller through an agreement, contingent or otherwise, to purchase, repurchase or pay the related indebtedness or to pledge any security therefor; (c) any liability or obligation secured by a Lien upon any of the Purchased Assets and/or upon which liabilities or obligations the Seller customarily pays interest or principal, whether or not the Seller assumed or become liable for the payment of such liabilities or obligations; and (d) any amendment, renewal, extension, revision or refunding of any such liability or obligation.

"IP" means any and all (a) intellectual property rights in or relating to software (including, without limitation, source code, executable code, data, databases and related documentation), schematics, firmware and technology, data and documentation used by or for the Business, (b) trademarks, service marks, trade dress, logos, slogans, tradenames, service names, internet domain names and rights in telephone numbers used by or for the Business, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all registrations, applications for registration and renewals in connection therewith, including, without limitation, those listed in the IP Schedule attached hereto as Schedule 3 (the "IP Schedule"), and any derivation or d/b/a names, (c) copyrights and applications, registrations and renewals in connection therewith used by or for the Business, (d) mask works and registrations and applications for registration in connection therewith used by or for the Business, (e) trade secrets, negative trade secrets and confidential business information, whether patentable or non-patentable and whether or not reduced to practice used by or for the Business including, without limitation, ideas, know-how, formulas, moral rights, compositions, manufacturing and product processes and techniques, research and development information, technical data, designs, drawings, specifications, copyrightable works, financial, marketing and business data, pricing and cost information, business and marketing plans and proposals and customer and supplier lists and information, (f) rights in internet web sites, internet domain names and keywords used by or for the Business, including, without limitation, those listed in the IP Schedule, (g) other tangible and intangible proprietary information, materials and rights relating to any of the foregoing including without limitation associated goodwill and remedies against

infringements thereof and rights of protection of an interest therein under the laws of all jurisdictions, (h) documents, records and files relating to design, end user documentation, manufacturing, quality control, sales, marketing or customer support for all intellectual property and proprietary rights described in (a) through (g) above, (i) copies and tangible embodiments all intellectual property and proprietary rights described in (a) through (g) above, and (j) all license and similar rights in any third-party product or any third-party intellectual property and proprietary rights of the types described in (a) through (i) above. For the avoidance of doubt, IP does not include any intellectual property related to any Excluded Assets.

"IP Contracts" means those contracts relating to the IP specified in the IP Contracts section of the Purchased Assets Schedule attached hereto as Schedule 1.

"Knowledge" means the actual knowledge of the directors (or limited liability company or other entity equivalent) and officers of the applicable party.

"Laws" means any laws, statutes, ordinances, regulations, rules, court decisions and orders of any foreign, federal, state or local government.

"Liabilities" means any direct or indirect liability, indebtedness, obligation, commitment, expense, claim, guaranty or endorsement of or by any Person of any type, whether accrued, absolute, contingent, matured, unmatured or other.

"Liens" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, or similar agreement, encumbrance or any other restriction or limitation whatsoever.

"Material Adverse Effect" means (a) with respect to the Business or the Purchased Assets, any material adverse effect or adverse change in the Business and/or the Purchased Assets or in the ability of the Seller to consummate the transactions contemplated hereby, and (b) with respect to the Buyer, any material adverse effect or adverse change in the assets, Liabilities or operations of the Buyer or on the ability of the Buyer to consummate the transactions contemplated hereby.

"Ordinary Course of Business" or any similar phrase shall mean the ordinary course of the Business consistent with the Seller's past practice; provided, however, that any action taken by the Seller that is contemplated by this Agreement shall be deemed to be in the Ordinary Course of Business.

"Person" means an individual, corporation, partnership, association, trust or other entity, including any governmental agency.

"Premium" means an amount equal to fifteen percent (15%) of the Client Portfolio Amount specified in the Auction Day Certificate.

"Proceedings" means any action, claim, suit, litigation or proceeding filed with any federal, State or local court or governmental authority.

"<u>Purchase Price</u>" means an amount equal to (a) as of the Auction Date, the aggregate of (i) the net funds employed with respect to the Approved A/R Assets and (ii) the outstanding principal amount of the Approved ABL Assets as per the "Data Tapes" generated by Seller's factoring software (the "<u>Data Tapes</u>"), <u>less</u> any Bad Debts, <u>less</u> any Term Loans and <u>less</u> any Special Reserves (such amount, the "<u>Client Portfolio Amount</u>"), <u>plus</u> (b) the Premium as specified in the Auction Date Certificate delivered by the Seller.

"<u>Purchase Price Certificate</u>" means the certificate substantially in the form of <u>Exhibit A-2</u> attached hereto delivered by the Seller to the Buyer on the Closing Date.

"<u>Purchased Assets</u>" means all rights, title, interest, property and assets of every kind, character and description, whether tangible or intangible, whether real, personal or mixed, whether accrued, contingent or otherwise, of the Seller which are owned, leased or licensed or used or held for use by the Seller in connection with the Business, wherever located, other than the Excluded Assets. The Purchased Assets shall include, without limitation, the following: the Assumed Contracts, the Accounts, the Receivables, the IP, the Goodwill, the Books and Records and any additional assets listed as Purchased Assets on the Purchased Assets Schedule attached hereto as <u>Schedule 1</u>.

"<u>Receivables</u>" means any and all accounts receivable relating to Approved A/R Assets.

"<u>Representative</u>" shall mean any officer, director, partner, manager, member, principal, attorney, agent, employee or other representative.

"<u>Return</u>" means any return, declaration, report, claim for refund, information return, or statement relating to Taxes, including all attachments thereto and any amendments or supplements thereof.

"<u>Sale Hearing</u>" means the hearing before the Bankruptcy Court to approve this Agreement and seeking entry of the Sale Order.

"<u>Sale Motion</u>" means a motion filed by Seller in the Bankruptcy Court seeking approval of this Agreement and the transactions contemplated herein, including the sale of the Transferred Assets, free and clear of all liens, claims, interests and encumbrances.

"<u>Sale Order</u>" means an order of the Bankruptcy Court approving the transactions contemplated by this Agreement, which order shall be reasonably acceptable in form and substance to the Buyer and the Seller, and not be materially inconsistent with the terms of this Agreement, which, among other things, (a) approves the transactions and the terms and conditions of this Agreement, (b) finds that notice of the hearing concerning approval of this Agreement and of the transactions contemplated by this Agreement was given in accordance with applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, and constitutes such notice as is appropriate under the particular circumstances, (c) finds that the Buyer is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code, (d) provides that the transactions contemplated by this Agreement are not subject to avoidance

pursuant to Section 363(n) of the Bankruptcy Code, and (e) provides for the vesting of the Purchased Assets in the Buyer, free and clear of all liens, claims and encumbrances.

"Sale Order Effective Date" means the first day on which the Sale Order has been entered and is not subject to any stay of effectiveness, whether such stay is prescribed by Bankruptcy Rule 6004(h), Bankruptcy Rule 6006(d), or any Court Order.

"Special Reserve" means any reserve that the policies of the Buyer or the Seller (as the case may be) reasonably require to be recorded in respect of a doubtful account included in the Accounts assigned by any single customer to the Seller.

"Tax" shall mean any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, production, ad valorem, real property gains, registration, profits, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, stamp, customs, duties, real property, personal property, capital stock, social security (or similar), unemployment, disability, payroll, license, lease, service, service use, employment, withholding, or other tax, fee, assessment, or charge of any kind whatsoever, together with any interest, penalties or additions to tax or additional amounts in respect of the foregoing, whether disputed or not, and including any obligations to indemnity or otherwise assume or succeed to the Tax liability of any other Person.

"Term Loan" means any asset-based loan identified as such in the Auction Date Certificate  based on the Data Tapes.

## ARTICLE II.
## PURCHASE AND SALE OF PURCHASED ASSETS

2.1     Sale of Purchased Assets.  Subject to the entry of the Sale Order by the Bankruptcy Court, and upon the terms and subject to the conditions contained herein, at the Closing, the Seller shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall purchase and acquire from the Seller, all of the Seller's right, title and interest as of the Closing Date in and to the Purchased Assets, for the consideration specified below in Section 2.3.  The Buyer acknowledges that the Seller is marketing the Purchased Assets and that the Buyer's offer of the Purchase Price is subject to overbid by a third party as further set out in the Bidding Procedures Motion.

2.2     Assumed Liabilities.  Upon the terms and subject to the conditions contained herein, at the Closing the Buyer shall assume and become responsible for the Assumed Liabilities (but only the Assumed Liabilities).

2.3     Purchase Price.

(a)     On the Closing Date, the Seller shall deliver to the Buyer (i) the Purchase Price  Certificate adjusting the Purchase Price by (x) the addition of any new advances made from the Auction Date to the Closing Date, and (y) the subtraction of any collections from the Auction

Date to the Closing Date (such adjustments, the "<u>Closing Price Adjustments</u>", and (ii) any Data Tapes and other information to support the Seller's calculation of the Closing Price Adjustments.

      (b)    Upon Closing:

      (i)    The Closing Payment, less a holdback of five percent (5%) of the Client Portfolio Amount[1] (the "<u>Holdback</u>"), shall be paid by the Buyer to the Seller by wire transfer of immediately available funds; and

      (ii)    The Holdback shall be deposited with the Escrow Agent and shall be released only in accordance with the terms of the Escrow Agreement and the Joint Release Instructions (as defined below). The fees and expenses of the Escrow Agent shall be borne by the Buyer and Seller in equal amounts.

      (c)    Subject to the provisions of <u>Section 9.3</u>, upon the Closing, all Liens of the Seller on the Accounts and other assets of the customers of its Business under the terms of the Customer Contracts shall be automatically assigned to the Buyer for the Buyer's sole and exclusive benefit, including the amount of any Customer Deposits. The Seller authorizes the Buyer to file Uniform Commercial Code ("<u>UCC</u>") amendments assigning to Buyer all UCC financing statements, as applicable, filed by the Seller on customers who are parties to the Customer Contracts. If requested in writing by the Buyer, the Seller will execute letters which rescind any prior notices to the account debtors under the Accounts and direct such account debtors to make any and all future payments on Accounts directly to the Buyer (or as the Buyer may otherwise direct).

      (d)    For the period of five (5) days following Closing, the Buyer and the Seller shall reconcile the amounts included in the Data Tapes and other data in order (1) to true-up the Client Portfolio Amount and related Receivables as of the Closing Date and (2) to identify and agree as to the amount, if any, of any Bad Debts, Term Loans and Special Reserves to the extent not already incorporated into the calculation of the Closing Payment (collectively, "<u>Deductions</u>"). If, during such five (5) day period, the Buyer discovers that the value of the Client Portfolio Amount may be higher than the actual value of the Client Portfolio Amount, the Buyer may, by notice in writing to the Seller prior to the expiration of such five (5) day period extend such five (5) day period to a period of twenty-five (25) days (including the initial five (5) days) for the purposes of completing such reconciliation. Once fully reconciled, including identification of Deductions, the Buyer and the Seller shall execute a revised Purchase Price Certificate and jointly instruct the Escrow Agent in writing (the "<u>Joint Release Instructions</u>") to release the funds held in the escrow account as follows: (i) if the reconciliation results in a reduction in the Closing Payment , the Joint Release Instructions shall provide that the net amount of the reduction in the Closing Payment shall be released to the Buyer, the remainder of the funds held in escrow shall be released to the Seller, and the net amount of the reduction shall be deemed a reduction in the Closing Price for all purposes; and (ii) if the reconciliation results in no change to the Closing Payment or an increase in the Closing Payment, the Joint Release Instructions shall provide that all funds held in escrow shall be released to the Seller, and the Buyer shall pay to the Seller by wire transfer of

---

[1] Note that this definition refers back to the NFE on the day of the Auction not as subsequently adjusted.

immediately available funds the amount of any such increase in the Closing Paymente within three ((3) business days of the execution of the revised Purchase Price Certificate.

(e) With respect to any Bad Debts the amount of which is deducted from the Closing Payment as above, the Buyer shall reassign the same to the Seller (together with all collateral and all UCC and other rights) for collection by the Seller in the Seller's sole and absolute discretion. The Buyer shall have no duty to collect Term Loans but the Buyer shall promptly remit to the Seller any amounts that it does in fact receive in respect of Term Loans (whether of principal or interest).

(f) In the event of any dispute between the parties regarding the calculation of the Deductions within such twenty-five (25) day period, the Buyer and the Seller (either together or individually) shall submit the unresolved issues to ___[TBA]_____ (the "Independent Accountant"). For the avoidance of doubt, the Independent Accountant shall not review or make any determination with respect to any other matter other than the unresolved issues. Each of the parties to this Agreement shall, and shall cause their respective officers, directors, employees, and representatives, to provide such information to the Independent Accountant as reasonably requested by the Independent Accountant. The Buyer and the Seller shall instruct the Independent Accountant to resolve the unresolved issues as promptly as practicable, and in any event within thirty (30) calendar days of the date on which such dispute is referred to the Independent Accountant, based solely on the provisions of this Agreement and the written submissions by the Buyer and the Seller, and not on an independent review; provided, however, that in resolving any unresolved issues, the Independent Accountant may not assign a value to any item greater than the greatest value for such item claimed by the Buyer or the Seller, or less than the smallest value for such item claimed by either the Buyer or the Seller. The fees and expenses of the Independent Accountant shall be allocated between Buyer and Seller based on the percentage which the portion of the contested amount not awarded to each party bears to the amount actually contested by such party. The determination of the Independent Accountant shall be set forth in a written statement delivered to the Buyer and the Seller and shall be final, conclusive and binding on the parties (except in the case of manifest arithmetic error).

2.4   Purchase Price Allocation.   The Buyer and the Seller shall mutually agree an allocation of the Purchase Price (as finally reconciled and any other amounts properly taken into account in the amount realized by the Seller or the cost basis to the Buyer) among the Purchased Assets in accordance with Code Section 1060 and the Treasury regulations thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate) (the "Purchase Price Allocation Schedule"), which allocation shall be binding upon the Seller and the Buyer.  The Buyer shall deliver the Buyer's proposed Purchase Price Allocation Schedule to the Seller within 60 days after the Closing Date or as soon as reasonably practicable and the Buyer and Seller shall use reasonable good faith efforts to agree the same as soon as possible and in any event within 30 days after such delivery by the Buyer. Any dispute between the Buyer and Seller regarding the Purchase Price Allocation Schedule shall be resolved by the Independent Accountant consistent with the provisions set forth in Section 2.3(f) above. The Buyer and the Seller and their Affiliates shall report, act and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such Purchase Price Allocation Schedule. The Seller shall timely and properly prepare, execute, file and deliver all such documents, forms and other information as the Buyer may reasonably request to prepare such Purchase Price Allocation

Schedule. Neither the Buyer nor the Seller shall take any position (whether in audits, tax returns or otherwise) that is inconsistent with such Purchase Price Allocation Schedule unless required to do so by applicable law, GAAP, or a final determination of a Governmental Authority of competent jurisdiction.

2.5 <u>Breakup Fee; Expense Reimbursement</u>. In addition to any other terms and conditions provided for in the Sale Order, in the event that (a) the Seller does not sell the Purchased Assets to the Buyer, (b) the Seller receives and accepts an offer from a third party to purchase the Purchased Assets, (c) such transaction is consummated despite the Buyer's readiness, willingness, and ability to consummate the transactions contemplated by this Agreement, and (d) this Agreement is terminated in accordance with the provisions of <u>Section 3.4</u>, then the Seller shall pay to the Buyer the sum of $300,000.00 (the "<u>Breakup Fee</u>") as liquidated damages, <u>plus</u> the reasonable and actual documented out-of-pocket costs and expenses incurred by the Buyer (including reasonable, documented attorney's fees and costs) in connection with the negotiation, preparation and performance of this Agreement and the transaction contemplated hereby (collectively, the "<u>Expense Reimbursement</u>") in an amount not to exceed $300,000.00, such payments to be made no later than fourteen (14) days after Buyer has provided to Seller a statement reflecting the amount of the Expense Reimbursement, together with documentation reasonably substantiating the costs and expenses incurred by Buyer comprising such Expense Reimbursement and no valid, substantiated objection being interposed thereto by the Seller. The Seller acknowledges that the inclusion in this Agreement of this <u>Section 2.5</u> is a condition precedent to the Buyer's execution of this Agreement and is necessary to ensure that the Buyer will continue to pursue the proposed acquisition of the Purchased Assets, and the Seller acknowledges that the Breakup Fee and Expense Reimbursement, if payable hereunder, (a) constitute actual and necessary costs and expenses of preserving the Seller's estate, within the meaning of section 503(b) of the Bankruptcy Code, (b) are of substantial benefit to the Seller's estate by, among other things, establishing a bid standard or minimum for other potential purchasers of the Purchased Assets and placing estate property in a sales configuration mode attracting other potential purchasers, (c) are reasonable and appropriate, including in light of the size and nature of the transactions contemplated by this Agreement and the efforts that have been or will be expended by the Buyer, notwithstanding that the proposed transaction is subject to higher and better offers, and (d) were negotiated by the parties at arm's-length and in good faith. The parties agree that under the circumstances described in this <u>Section 2.5,</u> the Buyer's losses would be difficult to quantify, and that the Breakup Fee and Expense Reimbursement are a reasonable measure and best estimate of the Buyer's damages resulting therefrom.

2.6 <u>Tax Withholding</u>. The Buyer and any other applicable withholding agent shall be entitled to deduct and withhold from the Purchase Price any Taxes or other amounts required under the Code or any applicable Law to be deducted and withheld. Any amounts that are so deducted or withheld shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

ARTICLE III.
CLOSING; TERMINATION

3.1 <u>Closing</u>. The closing of the transactions contemplated hereby (the "<u>Closing</u>") shall be held at the offices of Forshey Prostok LLP at 777 Main Street, Suite 1150, Fort Worth, TX

76102 (or such other place as the parties may agree) no later than the third (3rd) business day following the day on which (a) all of the conditions to each party's obligations hereunder have been satisfied or waived and (b) the Sale Order Effective Date has occurred, or at such other date as the parties may agree (the "Closing Date").

3.2    Closing Transactions.  Upon the terms and subject to the conditions set forth in this Agreement, following execution of this Agreement and simultaneously with the Closing:

(a)    To effect the sale and transfer referred to in Section 2.1, the Seller shall execute and deliver or cause to be executed and delivered to the Buyer:

(i)    a Bill of Sale, in the form of Exhibit B attached hereto, conveying all of the Seller's right, title and interest in and to the Purchased Assets;

(ii)    an Assignment of Customer Contracts, in the form of Exhibit C attached hereto, to the extent necessary to assign the Customer Contracts included in the Purchased Assets; and

(iii)    an intellectual property assignment agreement, in the form of Exhibit D attached hereto, conveying the Seller's right, title and interest in and to the IP (and any IP Contracts) together with such further assignment or instruments as may be reasonably required by the Buyer in connection therewith.

(b)    The Seller, the Buyer and the Escrow Agent shall have executed and delivered the Escrow Agreement.

(c)    The Seller shall have terminated, conditionally upon the Closing (with a termination date as of the Closing), all of the employees and contractors that previously performed work for the Business and shall have paid in full (i) all sums payable to such employees and contractors in connection with their respective services prior to the Closing Date and (ii) all payroll taxes and other similar Taxes associated with the Seller's employment of employees or engagement of independent contractors for taxable periods ending on or before the Closing Date and (iii), insurance premiums and other collateral obligations associated with the Seller's employment of employees or engagement of independent contractors and consultants. The Buyer shall have the right, but not the obligation, to hire any or all of the employees or contractors that previously performed work for the Business. For the avoidance of doubt, Seller shall not terminate any employee before Closing except for cause in the ordinary course of its business.

(d)    The Buyer shall deliver by wire transfer of immediately available funds the portion of the Closing Price payable to the Seller on the Closing Date pursuant to Section 2.3(b)(i) to the bank account(s) specified in writing by the Seller.

(e)    The Buyer shall deliver by wire transfer of immediately available funds the portion of the Closing Price required to be placed in Escrow on the Closing Date pursuant to Section 2.3(b)(ii) to the bank account specified in writing by the Escrow Agent pursuant to the Escrow Agreement.

(f)     The Buyer shall deliver to the Seller the certificate described in <u>Section 7.1</u>.

(g)     The Seller shall deliver to the Buyer the certificate described in <u>Section 8.1</u>.

3.3  <u>Form of Instruments</u>.  To the extent that a form of any document to be delivered hereunder is not attached as an exhibit hereto, such document shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to the Buyer and the Seller.

3.4  <u>Termination of this Agreement</u>. Subject to the liquidated damages provisions of <u>Section 2.5</u>, this Agreement may be terminated at any time prior to the Closing upon the occurrence of any one or more of the following:

(a)     by the mutual written agreement of the parties;

(b)     by the Seller upon written notice from the Seller to the Buyer if the sale procedures approved by the Bankruptcy Court permit or require the Seller to proceed with the offer of a third-party purchaser;

(c)     by either party upon written notice from the terminating party to the non-terminating party if any law or order becomes final and effective that prohibits or makes illegal the consummation of the transactions contemplated by this Agreement;

(d)     by the Buyer upon written notice from the Buyer to the Seller if (i) the Seller shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement (a "<u>Breach</u>"), or (ii) all of the conditions to the obligations of the Buyer set forth in <u>Article VIII</u> have been satisfied or waived (a "<u>Failed Condition</u>"), as applicable, and the Seller nevertheless refuses or fails to consummate the transactions contemplated in this Agreement; <u>provided</u>, that the Seller shall first be entitled to ten (10) days' prior written notice and the opportunity to cure, and <u>provided</u> <u>further</u> that the Buyer shall not be in breach in any material respect of this Agreement at such time; or

(e)     by the Seller upon written notice from the Seller to the Buyer if (i) the Buyer shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, or (ii) if all of the conditions set forth in <u>Article VII</u> have been satisfied or waived, as applicable, and the Buyer nevertheless refuses or fails to consummate the transactions contemplated in this Agreement; <u>provided</u>, that the Buyer shall first be entitled to ten (10) days' prior notice and the opportunity to cure (unless the Breach or Failed Condition that is the basis of Buyer's termination notice occurs or is completed less than 10 calendar days before the Closing Date, in which case no cure period shall apply), and <u>provided</u> <u>further</u> that the Seller shall not be in breach in any material respect of this Agreement at such time.

ARTICLE IV.
REPRESENTATIONS AND WARRANTIES OF THE SELLER

4.1  <u>Representations and Warranties of the Seller</u>.  **THE SALE OF THE PURCHASED ASSETS IS MADE "AS IS, WHERE IS, AND WITH ALL FAULTS" AND,**

**EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS <u>ARTICLE IV</u>, THE SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER**.

4.2 <u>Authority; Organization; Qualification; Binding Agreement</u>. The Seller is the legal and beneficial owner of, and has good and marketable title to, the Purchased Assets. All necessary limited liability company action with respect to the Seller has been taken to duly authorize the transactions contemplated by, and to execute and deliver the documents provided under, this Agreement. The Seller is duly formed and validly existing under the laws of the State of Texas, and has full legal right, power, and authority to enter into this Agreement and to perform its obligations hereunder, subject to entry of the Sale Order by the Bankruptcy Court. This Agreement and the documents contemplated hereby have been duly executed and delivered by the Seller, and assuming the due authorization, execution and delivery by the Buyer thereto, and subject to entry of the Sale Order by the Bankruptcy Court, are valid and binding agreements of the Seller, enforceable against the Seller in accordance with their terms.

4.3 <u>Finder's Fee.</u> The Seller has no liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which the Buyer or the Guarantor could become liable or obligated.

4.4 <u>Data Tapes</u>. The Data Tapes and other data used to calculate the Client Portfolio Amount have been prepared in a manner consistent with the accounting practices and policies of the Seller consistently applied and are true and accurate in all material respects.

ARTICLE V.
REPRESENTATIONS AND WARRANTIES OF THE BUYER AND GUARANTOR

The Buyer hereby represents and warrants to the Seller as follows, which representations and warranties are true and correct as of the date hereof:

5.1 <u>Organization of the Buyer</u>. The Buyer is duly organized, validly existing and in good standing under the laws of Florida.

5.2 <u>Authority of the Buyer</u>. The Buyer has the power and authority to enter into this Agreement and each agreement, document and instrument to be executed and delivered by the Buyer pursuant to this Agreement and to carry out the transactions contemplated hereby or thereby. The execution, delivery and performance by the Buyer of this Agreement and each such other agreement, document and instrument executed and delivered by the Buyer pursuant to this Agreement to which the Buyer is a party have been duly authorized by all necessary action of the Buyer, and no other action on the part of the Buyer is required in connection therewith. This Agreement and each agreement, document and instrument executed and delivered by the Buyer pursuant to this Agreement constitute, or when executed and delivered will constitute, valid and binding obligations of the Buyer enforceable against the Buyer in accordance with their terms, subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject to the effect of general principles of

equity, including, without limitation, the possible unavailability of specific performance or injunctive relief, regardless of whether considered in a proceeding in equity or at law.

5.3 <u>Sufficiency of Funds</u>. As of the Closing Date, the Buyer currently holds funds in available, unencumbered cash in an amount sufficient to pay the Closing Price upon the Closing.

5.4 <u>Finder's Fee</u>. The Buyer has no liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which the Seller could become liable or obligated.

5.5 <u>Investigations</u>. Without in any way limiting or qualifying the provisions of <u>Article IV</u>, the Buyer (a) has made such investigations of the Seller and the Business as the Buyer deemed appropriate for determining whether to enter into this Agreement, (b) has had access to such financial and other information about the Seller and the Business as the Buyer has requested, and (c) has had a reasonable opportunity to ask questions of and receive answers from executives of the Seller concerning the assets, liabilities, and business and financial condition and operations of the Business.

ARTICLE VI.
COVENANTS

6.1 <u>Further Assurances</u>. Upon the terms and subject to the conditions contained herein, the parties hereto shall, both before and after the Closing, (a) use all commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, (b) execute any documents, instruments or conveyances of any kind that may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder, and (c) cooperate with each other in connection with the foregoing.

6.2 <u>Conduct of Business</u>. Except as otherwise contemplated by the terms of this Agreement, as consented to by the Buyer in writing, or to the extent permitted or required by an order of the Bankruptcy Court, the Seller shall continue to operate the Business between the date of this Agreement and the Closing Date only in the Ordinary Course of Business, and, without limiting the generality of the foregoing obligation, the Seller shall:

(a) Use all reasonable efforts to protect, maintain in good operating condition and repair (normal wear and tear excepted) and preserve its ownership of the Purchased Assets;

(b) Not enter into, materially modify, or terminate any Customer Contract included in the Purchased Assets, except in the Ordinary Course of Business;

(c) Not sell, assign, transfer, convey, lease, mortgage, pledge or otherwise dispose of or encumber any of the Purchased Assets, except in the Ordinary Course of Business;

(d) Not incur any Liability relating to the Business that will constitute an Assumed Liability, except in the Ordinary Course of Business;

(e) Use all reasonable efforts to preserve the goodwill of all suppliers, customers, account debtors and others having business relations with the Business, and use commercially reasonable efforts to keep existing insurance policies covering the Purchased Assets in place until the Closing;

(f) Upon reasonable advance notice, permit the Buyer and its authorized Representatives during normal business hours to have access to all of the Books and Records, contracts and documents relating to the Business and furnish to the Buyer or its authorized Representatives such financial and other information with respect to the Business as the Buyer may from time to time reasonably request;

(g) Refrain from making or changing any Tax election, changing any annual accounting period, changing or adopting any method of accounting, filing any amended Tax Return, entering into any Tax closing agreement, settling any Tax claim or assessment relating to the Business, surrendering any right to claim a refund of Taxes, consenting to any extension or waiver of the limitations period applicable to any Tax claim or assessment relating to the Business or takin any other similar action, or omitting to take any action relating to the filing of any Tax Return or the payment of any Tax; and

(h) Give the Buyer prompt written notice of any Material Adverse Effect on the Seller.

6.3 <u>Sale Order</u>. The Seller shall file a motion with the Bankruptcy Court seeking a Sale Hearing to approve entry of the Sale Order and thereafter will use good faith and commercially reasonable efforts to obtain the Bankruptcy Court's entry of the Sale Order approving the consummation of the transactions contemplated by this Agreement. The Seller and the Buyer acknowledge that (i) this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval; (ii) in order to obtain such approval, the Seller has filed a Bidding Procedures Motion detailing Bidding Procedures whereby the Seller seeks a Bidding Procedures Order; (iii) the Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Purchased Assets; and (iv) such demonstration must include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties.

ARTICLE VII.
CONDITIONS TO OBLIGATIONS OF THE SELLER

The obligations of the Seller to consummate the transactions contemplated hereby are subject, in the reasonable discretion of the Seller, to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by the Seller:

7.1 <u>Representations, Warranties and Covenants</u>. All representations and warranties of the Buyer contained in this Agreement shall be true and correct in all material respects at and as of the date of this Agreement and at and as of the Closing Date, or in the case of representations and warranties that address matters as of a particular date, as of such date, and the Buyer shall have performed and satisfied in all material respects all agreements and covenants required hereby to be performed by it prior to or on the Closing Date. An authorized officer or manager (as the case

may be) of the Buyer shall have delivered a certificate to the Seller to the effect that each of the conditions set forth in this Section 7.1 and Section 7.4 is satisfied in all respects.

7.2     No Actions or Court Orders.  No action by any governmental authority or other Person shall have been instituted or, to the Seller's Knowledge, threatened that questions the validity or legality of the transactions contemplated hereby and that could reasonably be expected to materially damage the Seller if the transactions contemplated hereunder are consummated. There shall not be any Laws or Court Order that makes the purchase and sale of the Purchased Assets contemplated hereby illegal or otherwise prohibited.

7.3     Sale Order; Authorizations.  The Sale Order Effective Date shall have occurred, and the Buyer shall have obtained any other authorization, license or approval required under applicable law for the Buyer to consummate the transactions contemplated by this Agreement.

7.4     Material Adverse Effect.  Since the date of this Agreement, there shall not have occurred a Material Adverse Effect on the Buyer.

ARTICLE VIII.
CONDITIONS TO OBLIGATIONS OF THE BUYER

The obligations of the Buyer to consummate the transactions contemplated hereby are subject, in the reasonable discretion of the Buyer, to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by the Buyer:

8.1     Representations, Warranties and Covenants.  All representations and warranties of the Seller contained in this Agreement shall be true and correct in all material respects at and as of the date of this Agreement and at and as of the Closing Date, or in the case of representations and warranties that address matters as of a particular date, as of such date, and the Seller shall have performed and satisfied in all material respects all agreements and covenants required hereby to be performed by it prior to or on the Closing Date.  An authorized officer of the Seller shall have delivered a certificate to the Buyer to the effect that each of the conditions set forth in this Section 8.1 and Section 8.4 is satisfied in all respects.

8.2     No Actions or Court Orders.  No action by any governmental authority or other Person shall have been instituted or, to the Buyer's Knowledge, threatened that questions the validity or legality of the transactions contemplated hereby and that could reasonably be expected to materially damage the Buyer, the Purchased Assets or the Business if the transactions contemplated hereunder are consummated.  There shall not be any Laws or Court Order that makes the purchase and sale of the Purchased Assets contemplated hereby illegal or otherwise prohibited.

8.3     Sale Order; Authorizations.  The Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay pending appeal, and the Seller shall have obtained any other authorization, license or approval required under applicable law for the Seller to consummate the transactions contemplated by this Agreement.

8.4 .     Material Adverse Effect.  Since the date of this Agreement, there shall not have occurred a Material Adverse Effect on the Seller.

ARTICLE IX.
RIGHTS AND OBLIGATIONS SUBSEQUENT TO CLOSING

9.1 <u>Survival of Representations and Warranties</u>. Except with regard to any fraud of the Buyer in connection with this Agreement, the representations and warranties made by the Buyer in <u>Article V</u> of this Agreement shall survive the Closing Date for a period of, and claims based upon or arising out of such representations and warranties may only be asserted before the date which is, twenty-four (24) months after the Closing Date.

9.2 <u>Indemnification</u>.

(a) <u>By the Buyer</u>. The Buyer shall indemnify, defend, and hold harmless the Seller and its members, managers, officers and employees (the "<u>Seller Indemnified Parties</u>") from and against any and all loss, claim, damage, expense (including reasonable attorneys' fees and expenses and the fees and expenses of expert witnesses), whether or not involving a third-party claim (collectively, "<u>Damages</u>"), arising from or in connection with (i) any breach of any representation or warranty made by the Buyer; (ii) any breach of any other covenant or agreement made by the Buyer; and (iii) the operation and ownership of the Purchased Assets from and after the Closing.

(b) <u>Defense of Claims</u>.

(i) Subject to the limitations set forth in this <u>Article IX</u>, if any of the Seller Indemnified Parties seeks indemnification pursuant to this <u>Section 9.2</u>, such Seller Indemnified Parties shall give written notice to the Buyer promptly (and in any event within twenty (20) days) after the Seller Indemnified Parties become aware of the facts giving rise to such claim for indemnification (an "<u>Indemnified Claim</u>") specifying in reasonable detail the factual basis of the Indemnified Claim, including, to the extent available, the date that such Damages were paid, incurred, suffered, or sustained and, if applicable, the nature of the misrepresentation, breach of warranty or covenant to which such item is related (such notice an "<u>Indemnification Claim Notice</u>"). If the Indemnified Claim arises from the assertion of any claim, or the commencement of any suit, action, proceeding or remedial action brought by a Person that is not a party hereto (a "<u>Third Party Claim</u>"), any such notice to the Buyer shall be accompanied by a copy of any papers theretofore served on or delivered to the Seller Indemnified Parties in connection with such Third Party Claim.

(ii) If the Buyer does not object in writing within the thirty (30) day period after receipt of an Indemnification Claim Notice by delivery of a written notice of objection containing a reasonably detailed description of the facts and circumstances supporting an objection to the applicable indemnification claim (an "<u>Indemnification Claim Objection Notice</u>"), such failure to so object shall be an irrevocable acknowledgment by the Buyer that the Seller Indemnified Parties are entitled to the full amount of the Indemnified Claim set forth in such Indemnification Claim Notice and such amount shall become due and payable to the Seller Indemnified Parties no later than ten (10) business days following the end of the previous thirty (30) day period since the delivery of the Indemnification Claim Notice.

18

(iii)     In the event that the Buyer delivers an Indemnification Claim Objection Notice in accordance with <u>Section 9.2(b)(ii)</u>, the Buyer and the Seller shall attempt in good faith to agree upon the rights of the respective parties with respect to each of such Claims. If the Buyer and the Seller should so agree, a memorandum setting forth such agreement shall be prepared and signed by the relevant parties and whatever amount of Damages is so agreed shall become due and payable by the Buyer to the Seller Indemnified Parties no later than ten (10) business days following the date of such memorandum.

(iv)     If no such agreement can be reached after good faith negotiation and prior to thirty (30) days after delivery of an Indemnification Claim Objection Notice, the Seller Indemnified Parties may petition a court of competent jurisdiction for relief, in accordance with <u>Section 10.2</u> hereof.

(v)     In connection with any Third Party Claim giving rise to indemnification hereunder, upon receipt of notice of a Third Party Claim from the Seller Indemnified Parties pursuant to this <u>Section 9.2(b)</u>, and, to the extent the Seller Indemnified Parties so desire, the Buyer shall assume the defense and control of such Third Party Claim using counsel of its own choice, subject to the provisions of this <u>Section 9.2</u>. If the Buyer assumes the defense and control of a Third Party Claim as provided in this <u>Section 9.2(b)(v)</u>, such Claim shall not be compromised or settled without the written consent of the Seller, which consent shall not be unreasonably withheld, conditioned or delayed. The Seller shall, and shall cause each of its Affiliates and Representatives to, cooperate fully with the Buyer in connection with any Third Party Claim.

(d)     The Seller shall, and shall cause each of its Affiliates and Representatives to take all commercially reasonable actions to mitigate all Indemnified Claims incurred or reasonably expected to be incurred by them upon becoming aware of any fact, event or circumstance that has resulted in, or would be reasonably be expected to give rise to, any such Indemnified Claim.

9.3     <u>Consents to Assignment</u>.     Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Assumed Contracts or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof without the consent of any third party (whether or not such third party is a party to the Assumed Contract in question), would constitute a default thereof or in any way materially adversely affect the rights or obligations of the Buyer thereunder. With respect to any such Assumed Contracts, the Seller shall use all commercially reasonable efforts to obtain the consent of the other parties to such Assumed Contracts for the assignment thereof to the Buyer (it being understood, however, that the Seller shall not be required to make any payments or agree to any material undertakings in connection therewith), or confirmation from such parties that such consent is not required.

9.4     <u>Books and Records; Tax Matters; Liabilities</u>.

(a)     <u>Books and Records</u>.

(i)     Each party shall cooperate with and make available to the other party, upon reasonable advance written notice and during normal business hours, all Books and

Records, information and employees (without substantial disruption of employment) that are necessary or useful in connection with any tax inquiry, audit, investigation, dispute, or any other matter requiring any such Books and Records, information or employees for any reasonable business purpose.

(ii) Notwithstanding paragraph (i), neither party shall be obligated to take any action pursuant to such paragraph against the advice of its own counsel.

(iii) The Seller shall be entitled to retain a copy of the Books and Records as they stand on the Closing Date for the purposes of the Bankruptcy Case, including a copy of its database stored on Microsoft servers as of the Closing Date.

(b) Tax Matters. Each party shall (i) provide the other with such assistance as may reasonably be requested by either of them in connection with the preparation of any Return, audit or other examination by any taxing authority or judicial or administrative proceedings relating to Liability for taxes, (ii) retain and provide the other with any records or other information that may be relevant to such Return, audit or examination, proceeding or determination, and (iii) provide the other with any final determination of any such audit or examination, proceeding or determination that affects any amount required to be shown on any Return of the other for any taxable period. Without limiting the generality of the foregoing, the parties shall each retain, until the applicable statutes of limitation (without regard to extensions except to the extent notified by the other party in writing of such extensions for the respective Tax periods) have expired, copies of all Returns, supporting work schedules and other records or information that may be relevant to such Returns for all tax periods or portions thereof ending on or before the Closing Date and shall not destroy or otherwise dispose of any such records without first providing the other party with a reasonable opportunity to review and copy the same. The Buyer and the Seller shall each be liable for fifty percent (50%) of any and all transfer, documentary, stamp, sales, use, and other such Taxes and fees (including any penalties and interest) ("Transfer Taxes") incurred in connection with the transactions contemplated by this Agreement. Subject to receipt of the Buyer's contribution to any Transfer Taxes payable, the Seller will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and, if required by applicable law, the Buyer will, and will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation. Seller shall promptly provide to the Buyer copies of all filed Tax Returns relating to Transfer Taxes and reasonable written evidence that all Transfer Taxes have been timely paid to the appropriate Taxing Authority. For purposes of determining the amount of Taxes that are Excluded Liabilities, to the extent personal property or other periodic Taxes not based on income or receipts relate to any Purchased Assets or the Business in respect of a taxable period that begins on or prior to the Closing Date and ends after the Closing Date, the amount attributable to the portion of the taxable period up to and including the Closing Date shall be calculated as follows: the Taxes for the entire taxable period will be multiplied by a fraction, the numerator of which is the number of calendar days in the taxable period prior to and including the Closing Date, and the denominator of which is the number of calendar days in the entire taxable period. In the case of all other Taxes not described in the preceding sentence related to the Purchased Assets or the Business in respect of a taxable period that begins on or prior to the Closing Date and ends after the Closing Date, the amount attributable to the portion of the taxable period up to and including the Closing Date shall be determined on an interim closing of the books basis as if such taxable period ended as of the close of business on the Closing Date.

(c)     Liabilities.  Following the Closing, the Buyer shall pay or perform, or cause to be paid or performed, when due all of the Assumed Liabilities and shall hold the Seller harmless from and against the same.  The Seller shall pay or perform, or cause to be paid or performed, when due all of the Excluded Liabilities, and shall hold the Buyer harmless from and against the same.

9.5     Preservation of Confidentiality. The Buyer and the Seller acknowledge that they and InstaPay Flexible LLC are parties to a letter agreement concerning confidentiality dated September 27, 2021 (the "Confidentiality Agreement") and that the Confidentiality Agreement remains in full force and effect according to its terms.

9.6     Use of Name. Notwithstanding any other provision of this Agreement, the Seller shall be entitled to retain and use its corporate name for the purposes of the Bankruptcy Case, including and litigation necessary to preserve or collect any of the Excluded Assets.

9.7     Email Communications. Notwithstanding the transfer to the Buyer of the URLs referred to in Schedule 3 of this Agreement, the Buyer will ensure that for the period of two (2) years following Closing, emails addressed to the following will be automatically forwarded to such persons as directed and not saved on the Buyer's servers. The Buyer will respect and maintain the confidentiality of all such communications, acknowledging that many be privileged.

paul@flexiblefunding.com

steve@flexiblefunding.com

ssala@flexiblefunding.com

nash@flexiblefunding.com

steve@flexiblefund.com

ARTICLE X.
MISCELLANEOUS

10.1  Fees and Expenses.  Except as otherwise specified in this Agreement and whether or not the Closing takes place, each party hereto shall pay its own legal, accounting, out-of-pocket and other expenses incident to this Agreement and to any action taken by such party in preparation for carrying this Agreement into effect.

10.2  Governing Law; Attorneys' Fees.  This Agreement (including any claim or controversy arising out of or relating to this Agreement) shall be construed, performed and enforced in accordance with the laws of the State of Texas without regard to conflict of law principles that would result in the application of any law other than the law of the State of Texas. The prevailing party in any litigation to enforce the rights under this Agreement shall be entitled to an award of its costs and expenses, including reasonable attorneys' fees and expenses and the reasonable fees and expenses of expert witnesses.

10.3 <u>Exclusive Jurisdiction</u>.    The Bankruptcy Court shall have sole and exclusive jurisdiction of all matters arising out of, and related to, this Agreement and the transactions contemplated hereby.

10.4 <u>Notices</u>.    Any notice, request, demand or other communication required or permitted hereunder shall be in writing and shall be deemed to have been given (a) on the date received if sent by e-mail prior to 5:00pm Central Standard Time on a business day, and on the next business day if by e-mail if sent after such time, or (b) if sent by reputable courier service guaranteeing overnight delivery, on the next business day.  All notices to a party will be sent to the addresses set forth below or to such other address or Person as such party may designate by notice to each other party hereunder:

To the Seller:

> Flexible Funding Ltd. Liability Co.
> c/o Carle, Mackie, Power & Ross LLP
> 100 B Street, Suite 400
> Santa Rosa, CA 95401
> Attention: Paul DeLuca
> Email: paul@flexiblefunding.com

With copies (which shall
not constitute notice) to:

> Carle, Mackie, Power & Ross LLP
> 100 B Street, Suite 400
> Santa Rosa, CA 95401
> Attention: Simon R. Inman
> Email: srinman@cmprlaw.com

and:

> Forshey Prostok LLP
> 777 Main Street, Suite 1550
> Fort Worth, TX 76102
> Attention: Jeff Prostok
> Email: jprostok@forsheyprostok.com

To the Buyer:

> Steve McDonald, President
> eCapital Factoring (Holding) Corp.
> 360 Interstate North Parkway SE
> Suite 630
> Email: david.ciccolo@ecapital.com

With a copy (which shall
not constitute notice) to:

> Jonathan Staebler, General Counsel
> eCapital Group
> 20807 Biscayne Blvd, Suite 203
> Aventura FL 33180
> Email: jonathan.staebler@ecapital.com

Any notice given hereunder may be given on behalf of any party by its counsel or other authorized Representatives. Any reference to "business day" in this Agreement means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in Dallas, Texas.

10.5 <u>No Third-Party Beneficiaries</u>. This Agreement shall not confer any rights or remedies upon any Person other than the parties and their respective successors and permitted assigns.

10.6 <u>Construction</u>. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. The words "including" and "include" and other words of similar import will be deemed to be followed by the phrase "without limitation" where such phrase does not appear.

10.7 <u>Assignment</u>. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by any party without the prior written consent of the other party and of the Bankruptcy Court. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Notwithstanding the foregoing, the Buyer may, with prior written notice to the Seller, assign this Agreement and any or all rights, interests or obligations hereunder to an Affiliate of the Buyer. Upon any such permitted assignment, the references in this Agreement to the Buyer shall refer to such assignee unless the context otherwise requires.

10.8 <u>Captions and Plural</u>. The captions in this Agreement are for convenience only and shall not affect the construction or interpretation of any term or provision hereof. The use in this Agreement of the singular in reference to a party hereto shall be deemed to include the plural, as the context may require.

10.9 <u>Execution in Counterparts</u>. For the convenience of the parties and to facilitate execution, this Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

10.10 <u>Amendments</u>. This Agreement may not be amended or modified, nor may compliance with any condition or covenant set forth herein be waived, except by a writing duly and validly executed by each party hereto, or in the case of a waiver, the party waiving compliance.

10.11 <u>Public Disclosure</u>. No party shall issue any press release or make any other public announcement relating to the subject matter of this Agreement without the prior written consent of the other party.

10.12 <u>Force Majeure</u>. No liability shall result to either party from any delay in performance or from non-performance (other than non-payment) caused by circumstances beyond the reasonable control of such party, including, without limitation, acts of God, acts of terrorism

or violence, fire, flood, explosion, war, action or request of governmental authority, accident, labor trouble or shortage, inability to obtain material, power, equipment or transportation, or any other circumstances of a similar or different nature beyond such party's reasonable control.

        10.13      <u>Entire Agreement</u>.  This Agreement, together with the Confidentiality Agreement and including the exhibits and schedules hereto, reflects the entire agreement of the parties with respect to the subject matter hereof and supersedes all previous written or oral negotiations, commitments and writings to the extent they relate to the subject matter hereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be duly executed on their respective behalf, by their respective officers thereunto duly authorized, all as of the day and year first above written.

**SELLER:**

**Flexible Funding Ltd. Liability Co.**
a California limited liability company

By: _____
    Paul DeLuca, Manager

By: _____
    Steven Capper, Manager

**BUYER:**

**eCapital Factoring (Holding) Corp.**

By: _____
    Steve McDonald, President

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be duly executed on their respective behalf, by their respective officers thereunto duly authorized, all as of the day and year first above written.

**SELLER:**

**Flexible Funding Ltd. Liability Co.**
a California limited liability company

By: _____
    Paul DeLuca, Manager

By: _____
    Steven Capper, Manager

**BUYER:**

**eCapital Factoring (Holding) Corp.**

By: _____
    Steve McDonald, President

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be duly executed on their respective behalf, by their respective officers thereunto duly authorized, all as of the day and year first above written.

**SELLER:**

**Flexible Funding Ltd. Liability Co.**
a California limited liability company

By: _____
     Paul DeLuca, Manager

By: _____
     Steven Capper, Manager

**BUYER:**

**eCapital Factoring (Holding) Corp.**

By:

_____
     Steve McDonald, President

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

## SCHEDULE 1

### Purchased Assets Schedule

Purchased Assets

Customer Contracts

**Client Codes**

| | | | | | |
|---|---|---|---|---|---|
| 2092 | 2064 | 2080 | MP | 1745 | ZN |
| 2113 | 2090 | 1576 | 1895 | 2082 | |
| 1079 | 1666 | 2076 | 1033 | 2060 | |
| 2089 | 1066 | 1373 | RC | 2083 | |
| 2102 | 2059 | 1529 | 1757 | 2056 | |
| 2095 | 2105 | 1928 | 1911 | 1587 | |
| 1460 | 2073 | 1007 | 2078 | 2085 | |
| 2045 | 1823 | 1779 | 1984 | 1293 | |
| 1526 | 1513 | 2068 | 1163 | 2096 | |
| 1961 | DA | 2109 | 1163 | 2112 | |
| 2103 | 2099 | 1017 | PA | 2047 | |
| 2091 | 2097 | 1988 | 2111 | 2101 | |
| 1741 | 1246 | 1018 | 1511 | 2107 | |
| 2100 | 1508 | 1948 | 1313 | 1481 | |
| 2067 | 1120 | 2086 | 2071 | UT | |
| 1816 | EA | 1110 | 1612 | 1683 | |
| 1316 | ER | 1110 | 1712 | 2104 | |
| 1543 | 2110 | 1605 | 1712 | 2084 | |
| 1487 | 1613 | 2053 | 2106 | WC | |
| 1667 | 1606 | 2077 | 1663 | 3 | |

IP Contracts

None

## Other Contracts

| Name | Debtor | Type |
|---|---|---|
| Wells Fargo Bank N.A. Lockbox Services | Flexible Funding | Lockbox |
| Danilo Tenorio Raisi | Flexible Funding | Contract Employee |
| Marcos Hass Wakamatsu | Flexible Funding | Contract Employee |
| DFW Office Systems | Flexible Funding | Copier Lease |
| DFW Office Systems | Flexible Funding | Copier Service Agreement |
| FW Office Lease (AP Shale Logistics) Management Co, LLC | Flexible Funding | Office Lease |
| Advanced Funding Group | Flexible Funding | Referral Agreement |
| Alex Cervantes | Flexible Funding | Referral Agreement |
| Andew Spitz | Flexible Funding | Referral Agreement |
| Capital Equity Partner | Flexible Funding | Referral Agreement |
| Corporate Finance New | Flexible Funding | Referral Agreement |
| Corporate Finance New (Jack Tyger) | Flexible Funding | Referral Agreement |
| Dave Kooiman | Flexible Funding | Referral Agreement |
| Demsker Consulting (Rob Demsker) | Flexible Funding | Referral Agreement |
| Factor Finders, LLC | Flexible Funding | Referral Agreement |
| GRB Associates (Gary Baker) | Flexible Funding | Referral Agreement |
| Hunter Reid (PFC) | Flexible Funding | Referral Agreement |
| James Shalinsky (Advanced Funding Group) | Flexible Funding | Referral Agreement |
| Jeff Stone (T. Jeff Stone & Associates) | Flexible Funding | Referral Agreement |
| John Harraghy (Trust Funding Solutions) | Flexible Funding | Referral Agreement |
| JS Platinum Insurance | Flexible Funding | Referral Agreement |
| JVRC (Jesse Gutierrez) | Flexible Funding | Referral Agreement |
| Keystone Marketing (Bill Hansen) | Flexible Funding | Referral Agreement |
| Keystone Marketing LLC | Flexible Funding | Referral Agreement |
| Larry Holstein | Flexible Funding | Referral Agreement |
| Lilogy (Andrew James) | Flexible Funding | Referral Agreement |
| Meritus Capital | Flexible Funding | Referral Agreement |
| Michael DiManno (EmployInsure) | Flexible Funding | Referral Agreement |
| Michael Santos | Flexible Funding | Referral Agreement |
| Mike Santos (Workers Comp Access) | Flexible Funding | Referral Agreement |
| Paul McClintock | Flexible Funding | Referral Agreement |
| PEO Analysis (Chris Fitzjarrald) | Flexible Funding | Referral Agreement |
| Phil Cohen (Factor Finders) | Flexible Funding | Referral Agreement |
| Prestige Capital | Flexible Funding | Referral Agreement |
| Rupen Shah | Flexible Funding | Referral Agreement |
| Ryan Scott (Perk Benefits) | Flexible Funding | Referral Agreement |
| Sunny Arora (Metro Business Solutions) | Flexible Funding | Referral Agreement |
| The Corporate Advocate (Ray Blom) | Flexible Funding | Referral Agreement |
| Trey Pearce (T, L, & S LLC) | Flexible Funding | Referral Agreement |
| William Blenderman | Flexible Funding | Referral Agreement |
| WorkComp Solutions LLC | Flexible Funding | Referral Agreement |
| Ring Central | Flexible Funding | Software Provider |
| Flexible Website | Flexible Funding | Domains |
| Flexible M3 and M4 tech | Flexible Funding | Tech |

NDAs

| NDA Counterparty: |
| --- |
| Aedifex Ventures PR, LLC |
| AmeriFactors Financial Group LLC |
| Apex Capital Corp |
| Argo Partners |
| Bay View Funding |
| CoreFund Capital |
| Crestmark, A Division of Metabank, National Association |
| eCapital Corp |
| Encore Funding, Inc. |
| Equify Financial, LLC |
| Flat Rate Funding Group |
| Fourshore Partners |
| Freight Factoring Specialists, LLC |
| Goodman Capital Finance, a division of Independent Bank |
| LINE Financial Corp |
| Marblegate Asset Management, LLC |
| McArron Investments, LP |
| nFusion Capital Finance, LLC |
| Noor Associates |
| Petra Group Holdings LTD. |
| Porter Capital Corporation |
| Raistone Capital LLC |
| Revolution Capital (USA) Inc. |
| Sallyport Commercial Finance, LLC |
| White Oak Commercial Finance, LLC |

## SCHEDULE 2

### Excluded Accounts Schedule

| Client Code | Client Name | Client Type |
|---|---|---|
| 2072 | AMERICAN QUARTER CONSTRUCTION, LLC | ABL |
| 1975 | CONSTRUCTURE, INC | ABL |
| ECAP | ECAPITAL | TL |
| ENGS | ENGSTROM PARTICIPATION | Factoring |
| 1752 | ESSENTIAL STAFFING COMPANY | ABL |
| 2048 | GRAHAM COUNTY LAND COMPANY | ABL |
| 2048 | GRAHAM COUNTY LAND COMPANY | TL |
| 2048 | GRAHAM COUNTY LAND COMPANY | TL |
| 1538 | HORIZON HEALTH CONSULTANTS | ABL |
| 2038 | MHC LLC | ABL |
| 2065 | R&R OUTDOOR SERVICES | ABL |
| 899 | SJT PRECISION METAL, INC. | ABL |
| 899 | SJT PRECISION METAL, INC. | TL |
| 2057 | SUNCAP TECHNOLOGY INC | ABL |
| 2057 | SUNCAP TECHNOLOGY INC | TL |
| 1331 | TEMPS PLUS | ABL |
| 1331 | TEMPS PLUS | TL |
| 1484 | THE ODYSSEY GROUP | TL |
| GS | GRANITE SOLUTIONS GROUPE | ABL |

Retained Litigation Claims

| Name | Type | Description |
|---|---|---|
| Aesctic-New Vision | Litigation | Litigation-Pahl McCay |
| Apollo Search Partners | Litigation | Litigation-Pahl McCay |
| Country Fresh-Changing Lives | Litigation | Litigation-Pahl McCay |
| El Gallo Bakery | Litigation | Litigation-Pahl McCay |
| El Gallo Grill | Litigation | Litigation-Pahl McCay |
| Engstrom Participation with Millennium Funding and associated claim | Litigation | Collection account |
| Fresh Packing | Litigation | Litigation-Pahl McCay |
| Galca Judgement and Payment over Notice claims associated with Acc | Litigation | Litigation-Pahl McCay |
| Graham County Land Company | Litigation | Litigation-Ward &Smith |
| MB Enterprises | Litigation | Litigation-Pahl McCay |
| MB Voods/So.Cal | Litigation | Litigation-Pahl McCay |
| Que Moles | Litigation | Litigation-Pahl McCay |
| TPI | Litigation | Litigation-Pahl McCay |
| Constructure | Collect out account | Collection account |
| R&R | Collect out account | Collection account |
| Technical Works contract and cross corp guarantee of Constructure | | |
| Mowbray's Tree Service - All litigation and counterclaims | Litigation | Litigation |

## **SCHEDULE 3**

### **IP Schedule**

| Schedule # | Flexible  IP Assignment |
|---|---|
| 1. Marks | N/A |
| 2. Copyright | All html, css, and text files, and all configuration settings and layout schemes, each of which is stored in webflow which are used to generate www.flexiblefunding.com |
| 3. Domains | www.flexiblefund.com & www.flexiblefunding.com |
|  |  |
| IP Description | The website hosted at www.flexiblefund.com and the proprietary software and codebase at www.flexiblefunding.com known internally as M3 and M4 software packages hosted on the Microsoft Azure platform. |

## **EXHIBIT A-1**

### **Auction Date Certificate**

| | |
|---|---:|
| Loan amount of each Customer Contract that is an Assumed Contract: | $46,586,333.52 |
| Less Bad Debts: | None |
| Less Term Loans*: | ($396,823.80) |
| Less Special Reserves: | |
|   Palo Alto Staffing | ($15,000.00) |
|   Kidsembrace | ($90,000.00) |
|   Education Works** | (<u>$1,286,838.73</u>) |
|    Total Special Reserves: | ($1,391,838.73) |
| Client Portfolio Amount: | $44,797,670.99 |
| Premium: | |
|   Gross Premium Amount: | $6,719,650.65 |
|   Less: Palo Alto NFE Remaining Premium | ($7,492.77) |
|   Less: Unapplied Cash Impact on Premium | (<u>$157,882.84</u>) |
|    Net Premium Amount | $6,554,275.04 |
| Purchase Price: | $51,351,946.03 |

*Term loans to be collected by Buyer with collections remitted to the Seller's estate.

**Education Works: Buyer will purchase this account at Closing but with no change in the Client Portfolio Amount. After Closing, Seller will work with the Purchaser to put a DACA agreement into place with the client's bank.  If the DACA is effected within 60 days, the Purchaser will pay for the account's net funds employed as of the Closing Date, plus a 15% Premium.  If the DACA is not put in place within 60 days, the account will be returned to the Debtors' estate and a cash payment will be made by the Buyer to the Seller in the amount of the difference of the net funds employed as of the Closing Date and the net funds employed on the date the account is returned to the Debtor's estate to the extent that difference is a positive number. If the account terminates or defaults on its financing agreement, then Buyer has no liability to Seller in respect of the account. If the account refinances, then the Buyer shall pay over to the Seller the entire amount of principal that it receives in such refinancing, up to the amount of the net funds employed on the Closing Date, but shall have no duty to assign the account to the Seller.

**Executed as of the Closing Date**

**Flexible Funding Ltd. Liability Co.**

**a California limited liability company**

**By:** _____

         **Name: Paul DeLuca**

         **Title:  Manager**

**By:** _____

         **Name: Steven Capper**

         **Title:  Manager**

**EXHIBIT A-2**

**Form of Purchase Price Certificate**

Purchase Price:                                                                     $_____

Adjustments, if any, to:                                        $_____

Approved A/R Assets                                      $_____

Approved ABL Assets                                      $_____

Bad Debts:                                              $_____

Term Loans:                                            $_____

Special Reserves:                                    $ _____

Closing Payment:                                  $_____

Executed as of the Closing Date         (Executed as of the reconciliation date)

**Flexible Funding Ltd. Liability Co.**      **eCapital Factoring (Holding) Corp.**
a Texas limited liability company         a Florida corporation

By: _____         By: _____
         Name: Paul DeLuca                   Steve McDonald, President
         Title: Manager

By: _____
         Name: Steven Capper
         Title: Manager

## EXHIBIT B

### Form of Bill of Sale

### BILL OF SALE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Flexible Funding Ltd. Liability Co., a California limited liability company (the "Seller"), does hereby transfer, sell, assign, convey, and deliver to eCapital Factoring (Holding) Corp., a Florida corporation  (the "Buyer"), all right, title, and interest of the Seller in and to the Purchased Assets (as such term is defined in that certain Asset Purchase Agreement, dated as of _____, 2021, by and between the Buyer and the Seller).

The Seller hereby covenants and agrees that, at any time and from time to time forthwith upon the written request of the Buyer, the Seller will do, execute, acknowledge, and deliver, or cause to be done, executed, acknowledged, and delivered, each and all of such further acts, deeds, assignments, transfers, conveyances, and assurances as may reasonably be required by the Buyer in order to transfer, assign, convey, and deliver unto and vest in the Buyer all rights, title, and interest of the Seller in and to the Purchased Assets.

The Seller has caused this Bill of Sale to be duly executed on its behalf, by its officers thereunto duly authorized, as of October [__], 2021.

**Flexible Funding Ltd. Liability Co.**
a California limited liability company

By: _____
          Name: Paul DeLuca
          Title:  Manager

By: _____
          Name:  Steven Capper
          Title:    Manager

<u>EXHIBIT C</u>

**Form of Assignment of Customer Contracts**

**ASSIGNMENT OF CONTRACTS**

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Flexible Funding Ltd. Liability Co., a California limited liability company (the "<u>Seller</u>"), does hereby transfer and assign to eCapital Factoring (Holding) Corp., a Florida corporation (the "<u>Buyer</u>"), and the Buyer hereby accepts from the Seller, all right, title and interest of the Seller in and to each and every Assumed Contract (as such term is defined in that certain Asset Purchase Agreement, dated as of November 1, 2021, by and between the Buyer and the Seller), subject to Section 9.3 of the Agreement.

Each of the parties hereto shall execute and deliver, at the reasonable request of the other party hereto, such additional documents, instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Assignment of Contracts.

This Assignment of Contracts shall be governed by the law of the State of Texas without regard to conflict of law principles that would result in the application of any law other than the law of the State of Texas.

**Flexible Funding Ltd. Liability Co.**
a California limited liability company

By: _____
          Name: Paul DeLuca
          Title:  Manager

By:_____
          Name:  Steven Capper
          Title:   Manager

**eCapital Factoring (Holding) Corp.**
a Florida corporation

By:_____
          Steve McDonald, President

<u>EXHIBIT D</u>

**Form of Intellectual Property Assignment Agreement**

**INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

This Intellectual Property Assignment Agreement ("<u>Assignment Agreement</u>"), dated as of _____, 2021 (the "Effective Date"), by and between Flexible Funding Ltd. Liability Co., a California limited liability company (the "<u>Assignor</u>"), hereby assigns to eCapital Factoring (Holding) Corp., a Florida corporation (the "<u>Assignee</u>").

WHEREAS, in connection with the Asset Purchase Agreement dated as of November 1, 2021 by and among, inter alia, Assignor and Assignee (the "<u>Purchase Agreement</u>") the Assignors wish to assign and transfer to the Assignees the Assigned IP (as defined in the Purchase Agreement);

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in further consideration of the mutual covenants and agreements contained in the Purchase Agreement, the parties hereto agree as follows:

1.     <u>Assignment of Intellectual Property</u>. Assignor hereby sells, assigns, transfers, and conveys unto Assignee or its designees, all right, title, and interest, whether or not now existing, in and to the IP, including, without limitation, the Marks, Copyrights and Domain Names described individually and further assigned by the following specific provisions and accompanying <u>Schedules 1 through 3</u> of this Assignment Agreement. Capitalized terms used in this Assignment Agreement that are not defined in this Assignment Agreement shall have the meaning assigned in the Purchase Agreement.

2.     <u>Trademarks</u>. Assignor hereby sells, assigns, transfers, and conveys unto Assignees or its designees, all right, title, and interest (whether or not now existing) in and to all of the following, together with the goodwill of the business and products associated with and symbolized by the same (collectively, the "<u>Marks</u>"): all trademarks, service marks, logos, trade names, trade dress, logos, packaging design, slogans, registered and unregistered trademarks and service marks, and other marks of the Assignor and as set forth in <u>Schedule 1</u>, including all registrations and applications for registration thereof, together with the goodwill of the business symbolized by the Marks, and all common law rights relating thereto, and any and all claims for past infringement thereof, including all rights as opponents in any opposition or cancellation proceeding.

3.     <u>Copyrights</u>. Assignor hereby sells, assigns, transfers, and conveys unto Assignee or its designees, all right, title, and interest (whether or not now existing) in and to all of the following (collectively, the "<u>Copyrights</u>"): all registered and unregistered copyrights in both published and unpublished works, including, without limitation, all curricula, program materials, compilations, software, databases, software (including, without limitation, source codes, executable code, data, databases and related documentation), schematics, firmware and technology, data and documentation used in connection with the Business, and computer programs, manuals and other documentation and all copyright registrations and applications, and

all derivatives, translations, adaptations and combinations of the above of Assignor and as set forth in Schedule 2, including any and all renewals and extensions of such copyrights that may be secured under the laws now or hereafter pertaining thereto in the United States or in any other country, and any and all claims for past infringement thereof.

4.      Domain Names.   Assignor hereby sells, assigns, transfers, and conveys unto Assignee or its designees, all right, title, and interest (whether or not now existing) in and to all of the following (collectively, the "Domain Names"): all domain names of the Assignor and as set forth in Schedule 3.  Without limiting the foregoing, the Assignor agrees to promptly perform all actions required by the applicable domain name registrar to complete the conveyance of the Domain Names to the Assignees.  The Assignor agrees that it will not register or attempt to register any domain names after the Effective Date that include any of the Marks or Copyrights being assigned herewith or any variation thereof.

5.      Cooperation Post-Execution.    Following the execution of this Assignment Agreement, each party shall deliver to the other such further information and documents and shall execute and deliver to the other such further instruments and agreements as the other party shall reasonably request to consummate or confirm the transactions provided for in this Assignment Agreement, to accomplish the purpose of this Assignment Agreement or to assure to the other party the benefits of this Assignment Agreement.   Specifically, Assignor hereby authorizes the respective patent and trademark office, intellectual property office, or governmental agency in each jurisdiction to issue any and all patents, certificates of invention, utility models or other governmental grants or issuances that may be granted upon any of the Marks, Copyrights, or Domain Names in the name of Assignee, as the assignee to the entire interest therein.  The terms and conditions of this Assignment Agreement will inure to the benefit of Assignee, its successors, assigns, and other legal representatives and will be binding upon Assignor, its successors, assigns, and other legal representatives.

(signature page follows)

Intending to be bound, the parties have executed this Intellectual Property Assignment Agreement as of the Effective Date.

**ASSIGNOR:**                                        **ASSIGNEE:**

**Flexible Funding Ltd. Liability Co.**             **eCapital Factoring (Holding) Corp.**
a California limited liability company              a Florida corporation

By:_____
               Name: Paul DeLuca              By:_____
               Title:   Manager                        Steve McDonald, President


By:_____
               Name:  Steven Capper
               Title:   Manager

15

## **SCHEDULE 1**

**MARKS**

| Trademark Registration or Application No. | Country | Registration Date | Mark and First Named Owner |
|---|---|---|---|

## SCHEDULE 2

### REGISTERED AND UNREGISTERED COPYRIGHTS

All html, css, and text files, and all configuration settings and layout schemes, each of which is stored in webflow which are used to generate www.flexiblefunding.com

## SCHEDULE 3

## DOMAIN NAMES

www.flexiblefund.com

www.flexiblefunding.com

# EXHIBIT B

# CURE AMOUNTS

**Flexible Funding Ltd. Liability Co., et al**

**Case No. 21-42215-mxm11**

## Schedule of Assigned Contracts

**Debtor: Flexible Funding Ltd. Liability Co.**

**Revised: October 26, 2021**

| Name | Address | Contract Type | Description | Cure Amount |
|------|---------|---------------|-------------|-------------|
| ADP | 2735 N. Stemmons Fwy, Dallas, TX 75027 | Payroll & Benefits | PEO Payroll Provider with included health benefits | $0.00 |
| Advanced Funding Group | 9 Declaration Drive, Newtown, PA 18940 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Alex Cervantes | 9417 Victoria Av #B, Southgate, CA 90280 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Andew Spitz | 145 Jackson Dr, Orange, OH 44022 | Referral Agreement | Customer referral payment agreement | $0.00 |
| AP Shale Logistics Management Co, LLC | 5600 Clearfork Main Street, Ste 420 Fort Worth, TX 76109 | Office lease | Fort Worth, Texas Office Lease | $0.00 |
| Boston Properties | Boston Properties, Inc, 800 Boylston Street, Ste. 1900, Boston, MA 02199 | Office Lease | San Francisco - One Embarcardero Lease | $0.00 |
| Capital Equity Partner | 800 N. Haven Ave Suite 240, Ontario, CA 91764 | Referral Agreement | Customer referral payment agreement | $0.00 |

| Name | Address | Contract Type | Description | Cure Amount |
|---|---|---|---|---|
| Corporate Finance New | 14280 S Military Trail # 7892 PO Box 7892, Delray Beach, FL 33482 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Corporate Finance New (Jack Tyger) | 2905 S. Federal Hwy, Ste C12, Delray Beach, FL 33483 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Danilo Tenorio Raisi | Rua Jua, 65 Apt. 22, Sao Paolo, SP Brazil | Contract Employee | Contract software engineer | $0.00 |
| Dave Kooiman | 2910 Inland Empire Blvd., Ste 100, Ontario, CA 91761 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Demsker Consulting (Rob Demsker) | 3446 Lawton Ln., Pepper Pike, OH  44124 | Referral Agreement | Customer referral payment agreement | $0.00 |
| DFW Office Systems | 13719 Gamma Rd., Farmers Branch, TX  75244 | Copier Service Agreement | Copier Service Agreement | $0.00 |
| DFW Office Systems | 13720 Gamma Rd., Farmers Branch, TX  75244 | Copier Lease | Office Copier Lease | $0.00 |
| Duesenberg Investment Company, LLC,  c/o Topa Property Group, Inc., | 1800 Avenue of the Stars, Ste 650, LA, CA  90067 | Office Lease | LA Office Lease | $0.00 |
| Factor Finders, LLC | 25101 Chagrin Boulevard Suite 250, Cleveland, OH 44124 | Referral Agreement | Customer referral payment agreement | $0.00 |
| GRB Associates (Gary Baker) | 2 Nicols Court, West Harrison, NY, 10604 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Hunter Reid (PFC) | 82 Main Street East, Grimsby, ON  L3M1N3 | Referral Agreement | Customer referral payment agreement | $0.00 |
| James Shalinsky (Advanced Funding Group) | 9 Declaration Dr, Newtown, PA 18940 | Referral Agreement | Customer referral payment agreement | $0.00 |

| Name | Address | Contract Type | Description | Cure Amount |
|---|---|---|---|---|
| Jeff Stone (T. Jeff Stone & Associates) | 1920 Woodbridge Dr, McKinney, TX 75072 | Referral Agreement | Customer referral payment agreement | $0.00 |
| John Harraghy (Trust Funding Solutions) | 7 Rozella St., Newtown, PA 18940 | Referral Agreement | Customer referral payment agreement | $0.00 |
| JS Platinum Insurance | 4835 Hallmark Parkway, San Bernardino, CA 92404 | Referral Agreement | Customer referral payment agreement | $0.00 |
| JVRC (Jesse Gutierrez) | 5707 Corsa Ave., #105, Westlake Village, CA 91362 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Keystone Marketing (Bill Hansen) | 1322 South 2670 East, St. George, UT 84790 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Keystone Marketing LLC | 777 E. 700 So, St. George, UT 84790 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Larry Holstein | 20600 Chagrin Blvd, Ste 350, Cleveland, OH 44122 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Lilogy (Andrew James) | 60 Broad Street., Ste 2404, NY, NY 10004 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Marcos Hass Wakamatsu | Rua Rio Claro, n. 65 Apt 31 Barirro Olimpico, Sao Caetano do Sut Sao Paulo | Contract Employee | Contract software engineer | $0.00 |
| Meritus Capital | 50 California St Suite 1500, San Francisco, CA 94111 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Michael DiManno (EmployInsure) | 2365 Iron Point Rd., Ste 100, Folsom, CA 95630 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Michael Santos Insuran | 5666 La Jolla Blvd #303, La Jolla, CA 92037 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Microsoft | One Microsoft Way, Redmond, WA 98052 | Software Provider | Software provider | $0.00 |
| Mike Santos (Workers Comp Access) | 4179 Adams Ave, San Diego, CA 92116 | Referral Agreement | Customer referral payment agreement | $0.00 |

| Name | Address | Contract Type | Description | Cure Amount |
|---|---|---|---|---|
| Paul McClintock | 2524 Rivertowne Pkwy, Mount Pleasant, SC 29466 | Referral Agreement | Customer referral payment agreement | $0.00 |
| PEO Analysis (Chris Fitzjarrald) | 2028 S. Bentley Ave., #PH1, Los Angeles, CA 90025 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Phil Cohen (Factor Finders) | 25101 Chagrin Blvd, Ste 250, Cleveland, OH 44122 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Prestige Capital | 400 Kelby Street 10th Floor, Fort Lee, NJ 07024 | Referral Agreement | Customer referral payment agreement | $0.00 |
| QuickBooks | 2632 Marine Way Mountain View, CA 94043 | Software Provider | Software provider | $0.00 |
| Ring Central | 20 Davis Drive, Belmont, CA 94002 | Software Provider | Phone system software | $0.00 |
| Rupen Shah | 506 New Dover Rd., Colonia, NJ 07067 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Ryan Scott (Perk Benefits) | 2034 E. Marquette Dr., Gilbert, AZ 85234 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Salesforce | 2300 N Field St, Dallas, TX 75201 | Software Provider | Software provider | $0.00 |
| Sunny Arora (Metro Business Solutions) | 260 Middlesex Essex Turpike, Iselin, NJ 08830 | Referral Agreement | Customer referral payment agreement | $0.00 |
| The Corporate Advocate (Ray Blom) | 1455 S. Auto Center Drive, Ste 125, Ontario, CA 91761 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Tipalti | 1810 Gateway Dr., Ste 300, San Mateo, CA 94404 | Staffing | Offshore staffing provider | $0.00 |
| Trey Pearce (T, L, & S LLC) | 6000 Fairview Rd, Ste 1200, Charlotte, NC 28210 | Referral Agreement | Customer referral payment agreement | $0.00 |
| Wells Fargo Bank N.A. | 420 Montgomery St., 9th Flr, San Francisco, CA 94104 | Bank Service Provider | Treasury Management service provider | $0.00 |

4

| Name | Address | Contract Type | Description | Cure Amount |
|---|---|---|---|---|
| William Blenderman | 62 Golf Club Circle, Pawleys Island, SC 29585 | Referral Agreement | Customer referral payment agreement | $0.00 |
| WorkComp Solutions LLC | 9668 Milliken Ave Ste. 104-189, Rancho Cucamonga, CA 91730 | Referral Agreement | Customer referral payment agreement | $0.00 |

L:\JPROSTOK\Flexible Funding (C11) #6264\Pleadings\Flexible Sale Motion\Flexible Rev. List of Executory Contracts 10.26.21.docx