**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FLEXIBLE FUNDING LTD. LIABILITY CO., | § | |
| *et al.,* | § | Case No. 21-42215-11-mxm |
| | § | |
| Debtors. | § | |
| | § | (Jointly Administered) |

**AMENDED DISCLOSURE STATEMENT FOR CHAPTER 11
JOINT PLAN OF LIQUIDATION FOR FLEXIBLE FUNDING
LTD. LIABILITY CO. AND INSTAPAY FLEXIBLE, LLC**

Jeff P. Prostok
State Bar No. 16352500
Lynda L. Lankford
State Bar No. 11935020
Dylan T.F. Ross
State Bar No. 24104435
**FORSHEY PROSTOK LLP**
777 Main Street, Suite 1550
Fort Worth, Texas 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
llankford@forsheyprostok.com
dross@forsheyprostok.com

**ATTORNEYS FOR DEBTORS
AND DEBTORS-IN-POSSESSION**

DATED: ~~April 18~~ May ___, 2022

## TABLE OF CONTENTS

I. NOTICE TO HOLDERS OF CLAIMS AND INTERESTS ....................................................................... 1

    A.   Generally ................................................................................................................................... 1
    B.   Summary of Treatment under the Plan ................................................................................... 3

II. EXPLANATION OF CHAPTER 11 ................................................................................................... 5

    A.   Overview of Chapter 11 ........................................................................................................... 5
    B.   Plan of Reorganization ............................................................................................................ 5

III. THE DEBTORS AND THEIR BUSINESS ........................................................................................ 8

IV. THE CHAPTER 11 CASES ........................................................................................................... 8

    A.   Events Prior to Commencement of the Chapter 11 Cases ...................................................... 8
    B.   Sale of the Debtor's Assets in Chapter 11 ............................................................................... 9
    C.   Estate Professionals ................................................................................................................ 9
    D.   Professional Fees and Expenses ............................................................................................. 9
    E.   Schedules and Bar Date ........................................................................................................ 10

V. OVERVIEW OF THE PLAN ......................................................................................................... 10

    A.   Distributions to Creditors and Interest Holders ................................................................... 10
    B.   Means for Implementation of the Plan ................................................................................. 11
        1.   Continued Existence of the Debtors ............................................................................. 12
        2.   Vesting of Assets .......................................................................................................... 12
        3.   Assumption of Obligations to Make Distributions ....................................................... 13
        4.   Actions by Debtors and the Liquidating Debtors to Implement Plan ........................... 13
        5.   Management of the Liquidating Debtors ....................................................................... 13
        6.   Payment of Fees and Expenses to Plan Administrator ................................................. 14
        7.   Resignation, Replacement, or Termination of Plan Administrator ............................... 15
        8.   Dissolution of the Liquidating Debtors ......................................................................... 15
    C.   Oversight Committee ............................................................................................................ 15
        1.   Establishment ............................................................................................................... 15
        2.   Joint Interest ................................................................................................................. 16
        3.   Removal of Member ...................................................................................................... 16
        4.   Replacement of Member ............................................................................................... 17
        5.   Meeting of Plan Administrator and the Oversight Committee ..................................... 17
        6.   Oversight Committee Action without Meeting ............................................................. 17
        7.   Dispute Resolution ....................................................................................................... 17
        8.   Confidentiality of Information and Conflicts of Interest ............................................... 17
        9.   Appointment of Successor Plan Administrator ............................................................. 18
        10.   Oversight Committee Expenses .................................................................................... 18
        11.   Standard of Care; Indemnification; Exculpation .......................................................... 18
        12.   Reliance by Oversight Committee ................................................................................. 19
        13.   Dissolution of Oversight Committee ............................................................................. 20

VI. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......................................................... 20

VII. CONFIRMATION OF THE PLAN ............................................................................................... 20

    A.   Solicitation of Votes; Voting Procedures .............................................................................. 20
        1.   Ballots and Voting Deadlines ........................................................................................ 20
        2.   Parties-in-Interest Entitled to Vote .............................................................................. 21
        3.   Vote Required for Class Acceptance .............................................................................. 22

B.    Confirmation Hearing.................................................................................................. 22
C.    Requirements for Confirmation of the Plan..................................................................... 23
D.    Cramdown.................................................................................................................. 26

**VIII. RISK FACTORS**...................................................................................................... **28**

A.    Insufficient Acceptances .............................................................................................. 28
B.    Confirmation Risks..................................................................................................... 28
C.    Non-Occurrence of Conditions Precedent ...................................................................... 28
D.    Estimated Distributions under the Plan .......................................................................... 28

**IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**............................................. **29**

A.    Continuation of the Chapter 11 Cases ........................................................................... 29
B.    Alternative Plan of Reorganization ................................................................................ 29
C.    Chapter 7 Liquidation................................................................................................. 29

**X. CONCLUSION** ........................................................................................................ **30**

Flexible Funding Ltd. Liability Co. ("Flexible") and Instapay Flexible, LLC ("Instapay") (collectively, the "Debtors"), the debtors and debtors-in-possession in the above-captioned jointly administered chapter 11 cases, hereby submit this Disclosure Statement (this "Disclosure Statement") for the Chapter 11 Joint Plan of Liquidation for Flexible Funding Ltd. Liability Co. and Instapay Flexible, LLC (the "Plan"). This Disclosure Statement is to be used in connection with the solicitation of votes on the Plan, a copy of which is attached hereto as **Exhibit "1"**. Unless otherwise defined herein, capitalized terms used herein have the meanings ascribed thereto in the Plan (see Article I of the Plan). Parties-in-interest are urged to carefully review the Plan in conjunction with this Disclosure Statement.

For a general summary of the proposed treatment of Claims or Interests under the Plan, please see the chart below.

## I. NOTICE TO HOLDERS OF CLAIMS AND INTERESTS

### A. Generally

The purpose of this Disclosure Statement is to enable holders of Claims and Interests in Impaired Classes to make an informed decision in exercising their right to vote to accept or reject the Plan.

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

On _____, the Bankruptcy Court entered an Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined Hearing on Final Approval of Disclosure Statement and Confirmation of Plan and Related Deadlines, and (III) Approving Related Matters [Docket No. ____] (the "Solicitation Order"). Pursuant to section 105(d) of the Bankruptcy Code and Rule 3017 of the Federal Rules of Bankruptcy Procedure, the Solicitation Order (a) conditionally approved this Disclosure Statement, (b) set a combined hearing for final approval of this Disclosure Statement and confirmation of the Plan, (c) approved voting procedures, materials for solicitation of votes on the Plan, and form of notice, and (d) granted related relief, including establishment of certain deadlines relating to final approval of this Disclosure Statement and confirmation of the Plan. A copy of the Solicitation Order is included in the materials accompanying this Disclosure Statement. CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A FINAL DETERMINATION BY THE BANKRUPTCY COURT THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE OR A DETERMINATION REGARDING THE FAIRNESS OR MERITS OF THE PLAN.

The statements contained in the Disclosure Statement are made as of the date hereof unless another time is specified, and neither delivery of the Disclosure Statement nor any exchange of rights made in connection with the Plan shall, under any circumstances, create an implication that there has not been any change in the information set forth herein

since the date the Disclosure Statement and the materials relied on in preparation of the Disclosure Statement were compiled.

For the convenience of Creditors and parties-in-interest, this Disclosure Statement summarizes the terms of the Plan, but the Plan itself qualifies all summaries. This Disclosure Statement is qualified in its entirety by the terms of the Plan. If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan are controlling. In the event of conflict between the Plan and Confirmation Order, the Confirmation Order will control.

Each Claimant should consult the Claimant's individual attorney, accountant and/or financial advisor as to the effect of the Plan on such Claimant.

Each holder of a Claim or Interest entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtors' Estate and their professionals, no person has been authorized to use or promulgate any information concerning the Debtors, the Debtors' businesses, or the Plan, other than the information contained herein, in connection with the solicitation of votes to accept or reject the Plan. No holder of a Claim entitled to vote on the Plan should rely upon any information relating to the Debtors, the Debtors' businesses, or the Plan other than that contained in this Disclosure Statement and the exhibits thereto. Unless otherwise indicated, the source of all information set forth herein was the Debtors.

The Disclosure Statement may not be relied on for any purpose other than to determine whether to vote in favor of or against the Plan and related options and elections, and nothing contained herein shall constitute an offer to sell or purchase a security as defined by state or Federal securities law or an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtors or any other party, or be deemed conclusive evidence of the tax or other legal effects of the reorganization of the Debtors on holders of Claims or Interests. Certain of the information contained in the Disclosure Statement, by its nature, is forward looking, contains estimates and assumptions which may prove to be wrong, and contains forecasts which may prove to be wrong, or which may be materially different from actual results.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting on the enclosed Ballot and returning the Ballot to the address set forth on the Ballot, in the enclosed return envelope so that it will be received by no later than **5:00 p.m., Central Time, on _____**. If you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim or Interest, you may be bound by the Plan if it is accepted by the requisite holders of Claims or Interests.

TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN **5:00 p.m., Central Time, on _____**. For detailed voting

instructions and the name, address, and phone number of the person you may contact if you have questions regarding the voting procedures, this process is explained below.

Pursuant to section 105(d) of the Bankruptcy Code and Rule 3017 of the Bankruptcy Rules, the Bankruptcy Court has scheduled the Confirmation Hearing to consider final approval of the Disclosure Statement and confirmation of the Plan on _____, at _____.m., Central Time, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. The Bankruptcy Court has directed that objections, if any, to final approval of the Disclosure Statement and confirmation of the Plan be filed and served on or before _____.m. Central Time on _____. Any response to any objection to final approval of the Disclosure Statement or confirmation of the Plan must be filed by _____.m. Central Time on _____.

THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS AND INTERESTS TO VOTE TO ACCEPT THE PLAN.

**B.      Summary of Treatment under the Plan**

The following is an estimate of the numbers and amounts of classified Claims and Interests to receive treatment under the Plan, and a summary of the proposed treatment of such Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and to the Plan for a complete description of the classification and treatment of Claims and Interests.

The Bar Date for filing proofs of Claim is December 22, 2021. The tables below are drawn from the Debtors' Schedules and filed proofs of Claim. The final universe of Claims, as actually Allowed, may differ from these tables.  The Debtors specifically reserve all rights to object to the allowance of any filed or scheduled claim.

| Class | Treatment |
|---|---|
| **Class 1 – Priority Non-Tax Claims**<br><br>Estimated Amount: $~~25~~57,000<br><br>Estimated Number of Holders: 4 | **Unimpaired**<br><br>Paid in Cash in full on or before the applicable initial Plan Distribution Date.<br><br>**Estimated Recovery:  100%** |
| **Class 2 – Secured Tax Claims**<br><br>Estimated Amount: TBD<br><br>Estimated Number of Holders: 3 | **Unimpaired**<br><br>Paid in Cash in full on or before the applicable initial Plan Distribution Date.<br><br>**Estimated Recovery:  100%** |

| Class | Treatment |
|---|---|
| **Class 3 – Subordinated Secured Claim - Bison**<br><br>Estimated Amount: $2,000,000<br><br>Estimated Number of Holders: 1 | **Impaired**<br><br>Will be paid from Distributable Cash until paid in full before Class 6 receives any Distribution.<br><br>Bison and Medalist dispute the priority of payment as between them. Accordingly, the priority of payment as between Class 3 and Class 4 will be subject to the decision of the Bankruptcy Court or by agreement of the two parties.<br><br>**Estimated Recovery: 100%** |
| **Class 4 – Subordinated Secured Claim – Medalist**<br><br>Estimated Amount: $15,700,000<br><br>Estimated Number of Holders: 1 | **Impaired**<br><br>Will be paid from Distributable Cash until paid in full before Class 6 receives any Distribution.<br><br>Bison and Medalist dispute the priority of payment as between them. Accordingly, the priority of payment as between Class 3 and Class 4 will be subject to the decision of the Bankruptcy Court or by agreement of the two parties.<br><br>**Estimated Recovery: 100%** |
| **Class 5 – Other Secured Claims**<br><br>Estimated Amount: $120,000<br><br>Estimated Number of Holders: 1 | **Impaired**<br><br>Paid in full of Allowed Secured Claim to the extent of remaining Distributable Cash after Classes 3 and 4 have been paid in full, or collateral returned.<br><br>**Estimated Recovery: TBD** |
| **Class 6 – General Unsecured Claims**<br><br>Estimated Amount: $21.9 million<br><br>Estimated Number of Holders: 63 | **Impaired**<br><br>Paid a Pro Rata Share of Distributable Cash on hand after full payment of Classes 1 through 5.<br><br>**Estimated Recovery: TBD** |

| Class | Treatment |
|-------|-----------|
| **Class 7 – Interests** | **Impaired**<br><br>On and after the Effective Date, holders of Interests shall have no ability to direct or control the affairs of the Liquidating Debtors.<br><br>Holders of Interests shall be paid a Pro Rata Share of Distributable Cash on hand after full payment of Classes 1 through 5.<br><br>**Estimated Recovery:  TBD** |

The total universe of Claims, as ultimately Allowed, may be greater or smaller than as reflected in the above analysis.

## II. EXPLANATION OF CHAPTER 11

### A.    Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11, a debtor-in-possession may attempt to reorganize its business or liquidate its assets for the benefit of the debtor, its creditors, and other parties-in-interest. The Debtors' Chapter 11 Cases commenced with the filing of voluntary chapter 11 petitions by the Debtors on September 19, 2021.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee.

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, *inter alia,* for an automatic stay of all attempts to collect pre-petition claims from a debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

### B.    Plan of Reorganization

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtors' assets. In the Debtors' Chapter 11 Cases, the Plan proposes a

simple liquidation of the Debtors' assets and distribution of Cash to the holders of Allowed Claims in accordance with the priority standards set forth in the Bankruptcy Code.

The Plan provides for the substantive consolidation of the Debtors for purposes of voting and distributions under the Plan, such that any Claim against either of the Debtors will be deemed to have been filed against the consolidated Debtors.

After a plan of reorganization has been filed, the holders of impaired claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to holders of Claims against and Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

If all classes of claims and interests accept a plan of reorganization, the bankruptcy court may nonetheless still not confirm the plan unless the court independently determines that the requirements of section 1129 of the Bankruptcy Code have been satisfied. Section 1129 sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests of creditors" test and be "feasible." The "best interests of creditors" test generally requires that the value of the consideration to be distributed to the holders of claims and interests under a plan may not be less than those parties would receive if the debtor was liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, unless the plan calls for liquidation or further financial reorganization, the court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under the plan without the need for such liquidation or further financial reorganization.

The Debtors believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the "best interests of creditors" test and the "feasibility" test. The Debtors support confirmation of the Plan and urge all holders of impaired Claims to accept the Plan.

Chapter 11 does not require that each holder of a claim against or interest in a debtor vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan. At a minimum, however, the plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting in at least one class of impaired claims under the plan. The Bankruptcy Code also defines acceptance of the plan by a class of interests (equity securities) as acceptance by holders of two-thirds of the number of shares actually voting. In the Chapter 11 Cases, only the holders of Claims who actually vote will be counted as either accepting or rejecting the Plan.

In addition, classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or interests of that class are modified in any way under the plan. However, if holders of the claims or interests in a class do not receive or retain any property on account of such claims or interests, then each such holder is deemed to have voted to reject the plan and does not actually cast a vote to accept or reject the plan.

Under the Plan, Class 1 (Priority Non-Tax Claims) and Class 2 (Secured Tax Claims) are *unimpaired*. Therefore, such Classes are conclusively presumed to have accepted the Plan, and holders of Claims in such Classes will not cast ballots to accept or reject the Plan. Class 3 (Subordinated Secured Claim – Bison), Class 4 (Subordinated Secured Claim – Medalist), Class 5 (Other Secured Claims), Class 6 (General Unsecured Claims), and Class 7 (Interests) are *impaired* under the Plan. Holders of Claims in Classes 3, 4, 5, and 6 and holders of interests in Class 7 may cast ballots to accept or reject the Plan.

The bankruptcy court may also confirm a plan of reorganization or liquidation even though fewer than all the classes of impaired claims and interests accept it. For a plan to be confirmed despite its rejection by a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class of rejecting claims if, among other things, the plan provides:  (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and interests, that the holder of any claim or interest that is junior to the claims or interests of such class will not receive or retain on account of such junior claim or interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims, and (b) no senior class of claims is to receive more than 100% of the amount of the claims in such class.

The Debtors believe that the Plan has been structured so that it will satisfy these requirements as to any rejecting Class of Claims, and can therefore be confirmed, if necessary, over the objection of any Classes of Claims. The Debtors, however, reserve the right to request confirmation of the Plan under the "cramdown" provisions of section 1129 of the Bankruptcy Code.

## III. THE DEBTORS AND THEIR BUSINESS

The Debtors are privately held asset-based lending (ABL) and factoring companies, primarily focused on the staffing and transportation industries. Instapay is a wholly owned subsidiary of Flexible Funding. Instapay engages in factoring for clients in the transportation industry, while Flexible Funding focuses on ABL, mainly for the staffing industry.

Flexible Funding's ABL product enables its clients to fund and grow their businesses using the accounts receivable (AR) that they receive from their customers. Flexible Funding ordinarily makes revolving loans to its clients based on the value of their AR, less a reserve. Typical client terms provide for an 85-90% advance rate against AR. Flexible Funding refers to its clients' customers as "end debtors," as ultimately Flexible Funding is relying on the end debtor to make timely payments on the AR owed to Flexible Funding's clients. To ensure repayment, Flexible Funding's clients agree to have their customers pay Flexible Funding directly through its lockbox account. Flexible Funding applies those payments to the outstanding loan from its clients, reducing the loan balance. Flexible Funding receives requests for advances daily from its clients. Flexible Funding collects payments daily from end debtors, which payments reduce client loan balances and provide clients with availability for operating financing. Flexible Funding charges fees and interest to its clients based on the amount borrowed.

Similarly, Instapay also funds its clients based on their AR and collects from the clients' end debtors. Instapay, however, does not make revolving loans, but rather engages in true factoring, in which Instapay actually acquires the AR from its clients and becomes the owner of that AR. Instapay charges an up-front fee to factor a receivable—usually 3%, and advances the rest. Instapay clients are in the trucking industry. Instapay receives requests to purchase its clients' accounts receivable daily and receives payments on purchased accounts receivable daily. Funds received from purchased accounts receivable are applied to clients' outstanding availability to provide them daily liquidity.

The Debtors employ a staff that includes portfolio management, sales, and operations. The Debtors' workforce assists clients with funding requests, verifies the legitimacy of clients' AR, tracks end debtors to ensure payments are made in a timely fashion, maintains the Debtors' proprietary software system, engages in sales and marketing activities to find new clients, and manages the Debtors' relationship and borrowings with the Debtors' lender group.  As of the date of their bankruptcy filings, Flexible Funding and Instapay had between 600 and 700 combined clients, approximately 400 of which were then active, with a total portfolio of about $110 million in loans and factored receivables.

## IV. THE CHAPTER 11 CASES

### A.    Events Prior to Commencement of the Chapter 11 Cases

Prior to the commencement of these cases, the Debtors explored a wide variety of options for recapitalizing and/or restructuring their enterprise. Ultimately, the Debtors determined that they were likely to realize the highest and best value for their enterprise

through a sale of all or substantially all of their assets. The Debtors, through their financial advisors, marketed the Debtors' assets widely and aggressively for approximately several months before the commencement of these cases.

**B.    Sale of the Debtor's Assets in Chapter 11**

Both before and after the commencement of these chapter 11 cases, the Debtors engaged in good-faith and arm's-length negotiations for the sale of their assets. On October 15, 2021, the Bankruptcy Court entered an order approving notice and bidding procedures for a potential sale of substantially all the assets of Flexible. [Dkt. No. 110] On October 18, 2021, the Bankruptcy Court entered a similar order with respect to Instapay. [Dkt. No. 120] Ultimately, the highest and best offers for the Debtors' assets were received from affiliates of eCapital Corp. In November 2021, transactions were closed for the sale of substantially all of the Debtors' assets. The proceeds from the sales allowed the Debtors to retire the senior secured indebtedness owed to Umpqua Bank in full.  The remaining sale proceeds provide the primary source of funding for Distributions under the Plan.

**C.    Estate Professionals**

The following is a list of each of the Estate Professionals that have been employed, with a description of the role of each such Estate Professional:

| | |
|---|---|
| Candlewood Partners, LLC | Investment bankers and financial advisors for the Debtors in the Chapter 11 Cases |
| Forshey Prostok LLP | Attorneys for the Debtors in the Chapter 11 Cases |
| Ward and Smith PA | Special counsel for the Debtors in North Carolina state court litigation |

**D.    Professional Fees and Expenses**

On December 9, 2021, the Bankruptcy Court entered an order [Dkt. No. 267] authorizing, on an interim basis, the Debtors to pay to Ward and Smith PA fees in the amount of $132,101.50 for professional services rendered, and to reimburse the firm in the amount of $1,803.85 for expenses incurred, in the firm's representation of the Debtors in litigation styled *Flexible Funding Ltd. Liability Co. v. Graham County Land Company, L.L.C., et al.*, in Graham County, North Carolina.

On December 21, 2021, the Bankruptcy Court entered an order [Dkt. No. 298] authorizing, on an interim basis, the Debtors to pay to Candlewood Partners, LLC fees in the amount of $1,225,256.28 for professional services rendered, and to reimburse the firm in the amount of $16,672.33 in serving as the investment banker and financial advisor to the Debtors.

On December 30, 2021, the Bankruptcy Court entered an order [Dkt. No. 314] authorizing, on an interim basis, the Debtors to pay to Forshey Prostok LLP fees in the amount of $739,732.50 for professional services rendered, and to reimburse the firm in the amount of $7,965.54 for expenses incurred in serving as bankruptcy counsel for the Debtors.

### E.    Schedules and Bar Date

The Debtors' bankruptcy schedules were filed on November 5, 2021 [Docket No. 25 in Case No. 21-42214-mxm-11; Docket No. 185 in Case No. 21-42215-mxm11]. The Debtors' statements of financial affairs were also filed on November 5, 2021 [Docket No. 26 in Case No. 21-42214-mxm-11; Docket No. 186 in Case No. 21-42215-mxm11].

Pursuant to the *Order (I) Shortening the Bar Date for Filing Proofs of Claim, (II) Establishing Ramifications for Failure to Timely File Claims; (III) Approving Consolidated Notice of Shortened Bar Date, and (IV) Approving the Mailing of Notices* [Docket No. 250], the Court established December 22, 2021, as the bar date (deadline) for any person (except for a governmental unit) who asserts a claim in these cases to file a proof of claim with the Bankruptcy Court. The bar date for filing a proof of claim by a governmental unit is May 11, 2022.

## V. OVERVIEW OF THE PLAN

**THE FOLLOWING IS A SUMMARY OF THE MATTERS CONTEMPLATED TO OCCUR EITHER PURSUANT TO OR IN CONNECTION WITH THE CONSUMMATION OF THE PLAN. THIS SUMMARY HIGHLIGHTS THE SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN. THE FOLLOWING SUMMARY IS COMPLETELY QUALIFIED BY THE TERMS OF THE PLAN. IN THE EVENT OF ANY CONFLICT BETWEEN THE FOLLOWING SUMMARY AND THE PLAN, THE PLAN WILL CONTROL.**

### A.    Distributions to Creditors and Interest Holders

The Plan is a liquidating chapter 11 plan. It provides for the distribution of the proceeds from the sale of substantially all the Debtors' assets to all holders of Allowed Claims. The Plan organizes certain kinds of Claims into Classes, and leaves other kinds of Claims unclassified, as the Bankruptcy Code requires.

After full payment of Allowed Administrative Expenses, Allowed Priority Tax Claims, U.S. Trustee fees, Secured Tax Claims, and Priority Non-Tax Claims, Distributions to be made to holders of Allowed Claims in the following Classes will be made in a "waterfall" fashion, meaning that a higher priority class must be paid in full first before the next lower priority class will receive any distribution. The priorities of the Classes are as follows:

- First priority:[1]

    Class 3 Subordinated Secured Claim – Bison

    Class 4 Subordinated Secured Claim - Medalist

- Second priority – Class 5 Other Secured Claims

- Third priority - Class 6 General Unsecured Claims

- Fourth priority – Class 7 Interests

In other words, if the amount of Distributable Cash is sufficient to allow a 100% distribution to holders of Allowed Class 3 and Class 4 Subordinated Secured Claims, then holders of allowed Class 5 secured claims will receive a Pro Rata Share of distribution from the remaining Distributable Cash.  If the amount of Distributable Cash is sufficient to allow a 100% distribution to holders of Allowed Class 5 Claims, then each holder of an Allowed General Unsecured Claim will receive a Pro Rata Share of the remaining Distributable Cash on hand. If the amount of the remaining Distributable Cash allows full payment of all Allowed General Unsecured, then each holder of an Allowed Interest will receive a Pro Rata Share of the remaining Distributable Cash on hand.

Conversely, if Distributable Cash is insufficient to pay Allowed Class 3 and Class 4 Subordinated Secured Claims in full, then the waterfall stops and no distribution will be made on account of Allowed Other Secured Claims, Allowed General Unsecured Claims or Allowed Interests.

The Plan's distribution mechanism gives full effect to the priority of Claims and Interests as set forth in the Bankruptcy Code.

**B.      Substantive Consolidation of the Debtors**

For purposes of implementing the Plan, including for voting and Distributions to be made under the Plan, the Plan provides for the substantive consolidation of the Debtors. Substantive consolidation means: (a) all assets and liabilities of the Debtors will be deemed merged; (b) all guarantees by one Debtor of the obligations of the other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by the other Debtor and any joint or several liability of the Debtors will be deemed to be one obligation of the consolidated Debtors; (c) each and every Claim filed or to be filed in the Chapter 11 Cases of either Debtor will be deemed filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated

---

[1] Bison and Medalist are disputing the priority of payment as between their respective Claims.  The parties will seek a determination from the Bankruptcy Court on this issue.  Accordingly, the priority of payment as between Bison and Medalist will be subject to the determination by the Bankruptcy Court or otherwise by agreement of the two parties.

Debtors; and (d) all intercompany claims will be eliminated.

Substantive consolidation is warranted because the Debtors have historically been operated more akin to one company with two business divisions.  While each entity did keep separate books on the operational front to account for operational assets, revenues, and direct expenses, they have always been viewed as one single corporate unit by management for corporate overhead and administrative support services.  All corporate overhead was solely carried by Flex.  Instapay received the benefits of the corporate administrative support but was not billed for such benefits.  Both Debtors were obligors on the Umpqua secured line of credit and assets of both Debtors secure the obligation owed to the junior subordinated lender, Medalist.  Loan proceeds were used by both Debtors as needed without any accounting allocation.  Similarly, incoming revenue of the Debtors went into one lockbox under Flex's name and cash was used as needed by the Debtors.  The same practice remained unchanged post-petition.  Post-petition, proceeds from both asset sales were used to pay the senior secured line of credit in full without allocating, or apportioning, the debt to each of the Debtors.  For these reasons, there is no way to clearly discern what portion of the funds on hand at this time belongs to which of the Debtors.

Forcing the unwinding of the Debtors is anticipated to result in the estates incurring substantial cost and expenses in retaining accountants to apportion loan obligations and trace and segregate or allocate cash.  There will be associated time delays to the detriment of creditors and without any assurance of benefits to creditors of one or the other Debtors.

B.C.   **Means for Implementation of the Plan**

1.    **Funds Available for Distribution**

The Distributable Cash will consist of remaining sales proceeds as well as recoveries from the pursuit of Estate Claims. For that reason, the amount of Distributable Cash that will ultimately be available for distribution to creditors is unknown at this time as it will depend on the outcome of the pursuit of the Estate Claims.

2.    **Continued Existence of the Debtors**

The Debtors shall continue to exist after the Effective Date, with all the powers available to such legal entities, in accordance with applicable law and pursuant to their constituent documents. Upon the occurrence of the Effective Date, the Debtors shall be thereafter referred to as the Liquidating Debtors.

3.    **Vesting of Assets**

As of the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets, including all Cash, Estate Accounts Receivable, Estate Claims and Estate Defenses, shall vest in the Liquidating Debtors, free and clear of all rights, title, interests, claims, liens, encumbrances, and charges, except as expressly set forth in the Plan. On and after the Effective Date, the Liquidating Debtors may administer, use, acquire, or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions

of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Liquidating Debtors may pay the charges that they incur on or after the Effective Date for all fees, disbursements, expenses, or related support services of professionals without application to, or approval of, the Bankruptcy Court.

### 4. Assumption of Obligations to Make Distributions

The Liquidating Debtors shall be deemed to have assumed the obligations to make all Distributions pursuant to the Plan.

### 5. Actions by Debtors and the Liquidating Debtors to Implement Plan

The entry of the Confirmation Order shall constitute all necessary authorization for the Debtors and the Liquidating Debtors to take or cause to be taken all actions necessary or appropriate to consummate, implement or perform all provisions of this Plan on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, (a) all transfers of Assets, including to the Liquidating Debtors, that are to occur pursuant to the Plan; (b) the performance of the terms of the Plan and the making of all Distributions required under the Plan; and (c) subject to the terms of the Plan, entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

### 6. Management of the Liquidating Debtors

On the Effective Date, automatically and without further action, any and all remaining officers, directors, or managers of the Debtors shall be deemed to have resigned or withdrawn

On and after the Effective Date, the Plan will be administered by the Plan Administrator on behalf of the Liquidating Debtors, and all actions taken thereunder in the name of the Liquidating Debtors shall be taken through the Plan Administrator.

The Plan Administrator shall be designated no later than _____, 2022.  The Plan Administrator shall be deemed appointed upon entry of the Confirmation Order without further motion, application, notice, hearing, or other order of the Bankruptcy Code.

On and after the Effective Date, the Plan and the Post-Confirmation Estate including all Assets of the Liquidating Debtors shall be administered and managed under the direction of the Plan Administrator as provided by the terms of the Plan.  The Plan Administrator shall be responsible for the implementation of the Plan, including with respect to the management, control, and operation of the Liquidating Debtors and the Post-Confirmation Estate. The Plan Administrator shall have all powers and duties as are necessary to implement the Plan and shall act as the sole officer, director, and responsible person of the Liquidating Debtors. In the performance of his duties hereunder, the Plan Administrator shall

have the rights and powers of a debtor-in-possession under section 1107 of the Bankruptcy Code, and such other rights, powers, and duties incident to causing performance of the obligations under the Plan or otherwise as may be reasonably necessary, including, without limitation, the authority to file the Liquidating Debtors' tax returns, and issue final tax documents, including K-1s, as appropriate under applicable nonbankruptcy law evidencing the foregoing. Notwithstanding the foregoing, all Liquidating Debtor tax returns filed by the Plan Administrator shall either reflect (i) the election out of the Centralized Partnership Audit Regime under Section 6221(b), consistent with past practice and/or (ii) the designation of Paul Deluca as the Partnership Representative. In addition, as the taxpayers on the returns Paul Deluca and Steve Capper shall retain authority to make decisions regarding responding to and challenging any potential or actual enforcement actions by the taxing authorities

From and after the Effective Date, the Plan Administrator may, among other things, use, pledge, acquire, and/or dispose of any Assets of the Liquidating Debtors' Post-Confirmation Estate free of the restrictions imposed under the Bankruptcy Code and without prior Bankruptcy Code approval, provided that it is in conformance with this Plan and that the Bankruptcy Court retains jurisdiction over the Plan Administrator and this Plan.

The Confirmation Order shall provide the Plan Administrator with express authority to convey, transfer, and assign any and all property of the Liquidating Debtors' estate consistent with the terms of the Plan and to take all actions necessary to effectuate same.

The Plan Administrator, acting on behalf of Liquidating Debtors, shall have sole responsibility for making Distributions under the Plan and pursuing the Estate Claims (including the Avoidance Actions), and the collection and pursuit of the Estate Accounts Receivables on behalf of the Liquidating Debtors Post-Confirmation Estate.

Notwithstanding anything to the contrary in the Plan, the powers and authority of the Plan Administrator hereunder shall be subject to the powers and authority of the Oversight Committee as set forth in the Plan.

### 7.    Payment of Fees and Expenses to Plan Administrator and Professionals

The Plan Administrator may employ on behalf of himself, the Liquidating Debtors, and the Post-Confirmation Estate professional persons, as such term is used in the Bankruptcy Code, to assist the Plan Administrator to carry out the duties under this Plan. These professionals may be hired without the requirement that such professionals file employment applications for Bankruptcy Court approval of their employment, whether on an hourly, contingency fee or other basis, and shall be compensated without requirement that such professionals file interim or final applications for payment of post Effective Date fees, whether on an hourly, contingency fee or other basis. The Plan Administrator and his professionals shall be entitled to reimbursement of their reasonable and necessary expenses incurred in carrying out his duties under the Plan before any Distributions are required to be made on account of any Allowed Claims.  The Plan Administrator shall be compensated at his standard hourly rate for time spent administering the implementation of

the Plan and the resolution of objections to Claims, if any are asserted, without further motion or application to the Bankruptcy Court.

### 8.      Resignation, Replacement, or Termination of Plan Administrator

From and after the Effective Date the Plan Administrator or his successor shall continue to serve in his capacity as the sole officer, director, and responsible person of the Liquidating Debtors through the earlier of (a) the date the Liquidating Debtors are dissolved in accordance with the Plan; and (b) the date the Plan Administrator resigns or is replaced or terminated.  In the event that the Plan Administrator resigns or is unable to serve, a successor shall be appointed by the Oversight Committee as set forth in the Plan; *provided, however*, that holders of Allowed Claims retain the right to challenge the successor Plan Administrator in the Bankruptcy Court.

### 9.      Dissolution of the Liquidating Debtors

Unless otherwise set forth in the Plan, upon the liquidation of all assets of the Liquidating Debtors pursuant to the Plan, the payment of all amounts due to be paid by the Debtors or Liquidating Debtors under the Plan, and the filing by the Plan Administrator of a certification to that effect with the Bankruptcy Court, the Liquidating Debtors shall be deemed dissolved for all purposes without the necessity for any further actions to be taken by or on behalf of the Liquidating Debtors or payments to be made in connection therewith; *provided, however*, that the Plan Administrator shall file with the appropriate state authority a certificate of cancellation. From and after the Effective Date, the Liquidating Debtors shall not be required to file any document, or take any other action, to withdraw its business operation from any state in which the Liquidating Debtors were previously conducting its business operations.

### ~~C.~~D.   Oversight Committee

### 1.      Establishment

On the Effective Date, a committee comprised of five (5) members (the "Members") shall be formed and shall be referred to as the "Oversight Committee."  The Oversight Committee shall perform an advisory role in the administration of this Plan and the Liquidating Debtors.  The initial Members of the Oversight Committee will be comprised of Paul Deluca, Steve Capper, or their representatives, representatives of the two Subordinate Secured Claim holders if they choose to appoint such member(s), and one  unsecured creditor, if  willing to serve, as selected by interested unsecured creditors.  Once the Claim of a Subordinate Secured Claim holder is paid in full, it shall no longer serve as a Member of the Oversight Committee. Members of the Oversight Committee shall serve without compensation but shall be entitled to reimbursement of reasonable expenses upon the terms and conditions set forth in subsection ~~V.C.11~~ 6.14(j) of the Plan.

### 2.    Role of Oversight Committee

The Oversight Committee shall monitor, and the Plan Administrator shall consult with the Oversight Committee in connection with the administration of the Assets of the Liquidating Debtors by the Plan Administrator.  The Oversight Committee may provide advice or recommendations with respect to any action to be taken by the Plan Administrator in connection with, including, without limitation: (a) the arrangement of any sale, transfer or other disposition of Assets of the Liquidating Debtors; (b) the investment of any proceeds of Assets; (c) the conduct and settlement of litigation with respect to any Contested Claims and any Estate Claims (other than with respect to a De Minimis Claim); and (d) the making of any Distributions in respect of Allowed Claims.  All decisions of the Oversight Committee, and all actions, directives, approvals, and consents of the Oversight Committee required or contemplated hereunder, shall be effective upon a majority vote of the Members thereof, except that until the Claims of the Subordinate Secured Claim holders are paid in full, the votes of Mr. Capper, Mr. Deluca or their representatives, shall not count. Once the Claims of the Subordinate Secured Claim holders are paid in full, the votes of Mr. Capper, Mr. Deluca or their representatives shall count towards calculating the required majority vote. The votes of the Subordinate Secured Claim holders shall be weighted based upon the amount of the unpaid Class 3 and Class 4 Claim of each. In taking or failing to take any action hereunder, the Plan Administrator may rely upon a written statement (including signatures by counterpart facsimile or approval by electronic transmission) by such majority of the Oversight Committee. Neither the Oversight Committee nor its Members shall exercise any control or authority over Liquidating Debtors or the Assets that is inconsistent with the purposes or provisions of this Plan or the Confirmation Order.  To any extent a Member of the Oversight Committee has a conflict of interest with respect to any matter being handled by the Plan Administrator, such Member of the Oversight Committee shall recuse themselves and be recused from any such discussions.

### 3.    Joint Interest

Privileged communications may be shared among the Plan Administrator and the Oversight Committee (and their respective professionals) without compromising the privileged nature of the communications in accordance with the "joint interest" doctrine. For the avoidance of doubt, subsection 6.13(c) of the Plan shall constitute an acknowledgment that the Plan Administrator and the Oversight Committee (and each of its Members individually) share a "joint interest" with respect to, among other things, the Plan, the Estate Claims, and the Assets.

### 4.    Removal of Member

(a)    Removal for Disability.  Subject to Bankruptcy court approval, a Member of the Oversight Committee may be removed by a unanimous vote of all other Members upon a finding that such Member is unable to perform his or her duties due to illness or other physical or mental disability.

(b)    Removal for Cause. Subject to Bankruptcy Court approval, a Member of the Oversight Committee may be removed for cause by a unanimous vote of all other

Members of the Oversight Committee. "Cause" shall include, without limitation: (a) fraud or willful misconduct in connection with the affairs of the Liquidating Debtors and Assets; or (b) breach of fiduciary duty.

### 5. Replacement of Member

If any Member of the Oversight Committee resigns or is removed as an Oversight Committee Member, such Member may be replaced by a unanimous vote of the remaining members of the Oversight Committee. If any position on the Oversight Committee remains vacant for more than thirty (30) days, such vacancy may be filled within fifteen (15) days thereafter by the designation of the Plan Administrator without the requirement of a vote by the other members of the Oversight Committee. The Oversight Committee will continue to fully function even while a position on the Oversight Committee remains vacant, with the Plan Administrator breaking any ties.

### 6. Meeting of Plan Administrator and the Oversight Committee

Meetings of the Oversight Committee and the Plan Administrator are to be held with such frequency and at such place as the Oversight Committee may determine in its sole discretion.

### 7. Oversight Committee Action without Meeting

Any action required or permitted to be taken by the Oversight Committee may be taken without a meeting if the action is taken by unanimous written consent of the Oversight Committee as evidenced by one or more written consents describing the action taken, signed by all Members of the Oversight Committee, and recorded in the minutes or other transcript of proceedings of the Oversight Committee and the Plan Administrator.

### 8. Dispute Resolution

In the event of a dispute between the Plan Administrator and the Oversight Committee, or between Members of the Oversight Committee, as to the proper course of action with respect to the decisions of the Oversight Committee consistent with its role under subsection 6.14(b) above or involving an allegation that either party has failed to act in a manner consistent with the Plan or the Confirmation Order, the parties shall meet and confer and attempt to reach a consensual resolution of the dispute. Should a consensual resolution not be reached, the Plan Administrator or the Oversight Committee or any of its Members may seek appropriate relief from the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to resolve such disputes.

### 9. Confidentiality of Information and Conflicts of Interest

The Plan Administrator shall have authority to exclude any Oversight Committee Member from any deliberations, or withhold any information from any Oversight Committee Member, regarding matters affecting the Liquidating Debtors or the Assets in which such excluded Member is encumbered by a conflict of interest that has been disclosed or

otherwise becomes known to the Plan Administrator. Any Oversight Committee Member that is excluded from deliberations or denied access to information under subsection 6.14(i) may challenge the Plan Administrator's determination in accordance with the dispute resolution procedure set forth in subsection 6.14(h) of the Plan.

### 10. Oversight Committee Expenses

Each Member of the Oversight Committee shall be entitled to reimbursement of such Member's reasonable and necessary expenses incurred while carrying out his or her duties as a member of the Oversight Committee. The reimbursement of expenses of the Oversight Committee Members shall be paid out of applicable Assets. On or before the last date of each month following the month for which reimbursement is sought, each member of the Oversight Committee shall deliver to the Plan Administrator, its counsel, and the other Members of the Oversight Committee a monthly statement of expenses incurred in carrying out such Member's duties. The Plan Administrator, its counsel, and the other Members of the Oversight Committee will have fifteen (15) days from the date such statement is received to review the statement and object to such statement by serving a written objection on the member of the Oversight Committee making the request, which objection shall set forth the precise nature of the objection and the amount at issue. At the expiration of the fifteen (15) day period, the Plan Administrator shall promptly pay out of the Assets, to the extent available, and, in the Plan Administrator's discretion, to the extent that sufficient assets remain to administer the Plan, 100% of the amounts requested, except for the portion of such fees and disbursements to which an objection has been made. The parties shall attempt to consensually resolve objections, if any, to any monthly statement. If the parties are unable to reach a consensual resolution of any such objection, the party that received an objection to its expenses may seek payment of such expenses by filing a motion with the Bankruptcy Court on proper notice to the Plan Administrator and its counsel.

### 11. Appointment of Successor Plan Administrator

In the event of the death (in the case of a Plan Administrator that is a natural person), dissolution (in the case of a Plan Administrator that is not a natural person), resignation, incompetency or removal of the Plan Administrator, the members of the Oversight Committee shall, by majority vote, designate a successor Plan Administrator. Such appointment shall specify the date when such appointment shall be effective. Every successor Plan Administrator appointed hereunder shall execute, acknowledge and deliver to the Bankruptcy Court and to the retiring Plan Administrator an instrument accepting the appointment and agreeing to be bound by the terms of the Plan, and shall additionally file with the Bankruptcy Court an affidavit demonstrating that such Person is a "disinterested person," as defined by section 101(14) of the Bankruptcy Code, and thereupon the successor Plan Administrator, without any further act, deed, or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Plan Administrator.

### 12. Standard of Care; Indemnification; Exculpation

Neither the Oversight Committee nor any of its Members, or any duly designated agent or representatives of any such party shall be liable for the act, default, or misconduct

of any other Member of the Oversight Committee, nor shall any Member be liable for anything other than such Member's own gross negligence or willful misconduct as determined by Final Order of a court of competent jurisdiction. The Oversight Committee and its Members shall be defended, held harmless, and indemnified from time to time from the Assets against any and all losses, claims, costs, expenses and liabilities to which the Oversight Committee or its Members may be subject by reason of the Oversight Committee's or its Members' execution of their duties under the Plan; *provided, however,* that the Oversight Committee or any Member shall not be entitled to indemnification if and to the extent the Oversight Committee or the particular Member is found by a Final Order of a court of competent jurisdiction to have committed willful misconduct or gross negligence. If the Oversight Committee or its Members become involved in any action, proceeding, or investigation in connection with any matter arising out of or in connection with the Plan, the Plan Administrator shall periodically advance or otherwise reimburse on demand the Oversight Committee or its Members reasonable legal and other expenses (including, without limitation, the cost of any investigation and preparation and attorney fees, expert fees, disbursements, and related expenses) incurred in connection therewith, but the Oversight Committee or its Members shall be required to repay promptly to the Plan Administrator the amount of any such advanced or reimbursed expenses paid to the Oversight Committee or its Members if and to the extent that it is determined by Final Order of a court of competent jurisdiction that the Oversight Committee or a particular Member engaged in willful misconduct or gross negligence in connection with the administration of the Plan with respect to the specific matters as to which such expenses were incurred. The Oversight Committee and its Members, agents, or representatives, if any, shall be likewise defended, held harmless and indemnified in the same manner and to the same extent. The Oversight Committee and its Members may, in connection with the performance of their duties, and in their sole and absolute discretion, consult with the Plan Administrator's counsel and any other professional advisors directly retained by the Oversight Committee or counsel to a Member of the Oversight Committee, and the Oversight Committee or Members thereof shall not be liable for anything done or omitted or suffered to be done in accordance with the advice or opinions of such professionals. If the Oversight Committee or any Member determines not to consult with counsel, accountants, or other professionals, it shall not be deemed to impose any liability on the Oversight Committee or its Members and/or agents or representatives.

**13.     Reliance by Oversight Committee**

The Oversight Committee may rely, and shall be fully protected personally in acting upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that the Oversight Committee have no reasonable belief to be other than genuine and to have been signed or presented other than by the proper party or parties or, in the case of facsimile transmissions, to have been sent other than by the proper party or parties, in each case without obligation to satisfy itself that the same was given in good faith and without responsibility for errors in delivery, transmission or receipt.

### 14.      Dissolution of Oversight Committee

Upon the certification by the Plan Administrator that all Contested Claims have been disposed of and all Assets have been distributed, abandoned, or otherwise disposed of, the members of the Oversight Committee shall resign their positions, whereupon they shall be discharged from further duties and responsibilities and the Oversight Committee shall be dissolved.

## VI. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE PLAN AND ITS RELATED TAX CONSEQUENCES ARE COMPLEX. MOREOVER, MANY OF THE INTERNAL REVENUE CODE PROVISIONS DEALING WITH THE FEDERAL INCOME TAX ISSUES ARISING FROM THE PLAN HAVE BEEN THE SUBJECT OF RECENT LEGISLATION AND, AS A RESULT, MAY BE SUBJECT TO AS YET UNKNOWN ADMINISTRATIVE OR JUDICIAL INTERPRETATIONS. THE DEBTORS HAVE NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE (THE "IRS") OR AN OPINION OF COUNSEL WITH RESPECT TO THESE MATTERS. ACCORDINGLY, NO ASSURANCE CAN BE GIVEN AS TO THE INTERPRETATION THAT THE IRS WILL ADOPT. THERE ALSO MAY BE STATE, LOCAL OR OTHER TAX CONSIDERATIONS APPLICABLE TO EACH CREDITOR. CREDITORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND OTHER TAX LAWS.

## VII. CONFIRMATION OF THE PLAN

**A.      Solicitation of Votes; Voting Procedures**

### 1.      Ballots and Voting Deadlines

A Ballot to be used for voting to accept or reject the Plan, together with a postage-paid return envelope, is enclosed with a copy of this Disclosure Statement mailed to all holders of Claims and Interests entitled to vote. BEFORE COMPLETING YOUR BALLOT, PLEASE READ CAREFULLY THE INSTRUCTION SHEET THAT ACCOMPANIES THE BALLOT.

The Bankruptcy Court has directed that, in order to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be received no later than **5:00 p.m., Central Time, on _____,** at the following address:

> Forshey Prostok LLP
> Attn: Tandy Levario
> 777 Main Street, Suite 1550
> Fort Worth, Texas 76102

YOUR BALLOT MAY NOT BE COUNTED IF IT IS RECEIVED AT THE ABOVE ADDRESS AFTER **5:00 P.M., CENTRAL TIME, ON _____.**

### 2.    Parties-in-Interest Entitled to Vote

The holder of a Claim or Interest may vote to accept or reject the Plan only if the Plan impairs the Class in which such Claim or Interest is classified. Under the Plan, impairment of Classes is as follows:

| CLASS | IMPAIRED? | ENTITLED TO VOTE ON THE PLAN? |
|-------|-----------|-------------------------------|
| Class 1 – Priority Non-Tax Claims | No | No |
| Class 2 – Secured Tax Claims | No | No |
| Class 3 – Subordinated Secured Claim – Bison | Yes | Yes |
| Class 4 – Subordinated Secured Claim – Medalist | Yes | Yes |
| Class 5 – Other Secured Claims | Yes | Yes |
| Class 6 – General Unsecured Claims | Yes | Yes |
| Class 7 – Interests | Yes | Yes |

Any Claim or Interest as to which an Objection has been filed is not entitled to vote unless the Bankruptcy Court, upon application of the holder to whose Claim or Interest an Objection has been made, temporarily allows such Claim or Interest in an amount that it deems proper for the purpose of accepting or rejecting the Plan. Any such application must be heard and determined by the Bankruptcy Court on or before commencement of the Confirmation Hearing. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT COUNSEL FOR THE DEBTORS AT THE FOLLOWING ADDRESS:

Jeff P. Prostok
State Bar No. 16352500
Lynda L. Lankford
State Bar No. 11935020
Dylan T.F. Ross
State Bar No. 24104435
**FORSHEY PROSTOK LLP**
777 Main Street, Suite 1550
Fort Worth, Texas 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
llankford@forsheyprostok.com
dross@forsheyprostok.com

### 3.    Vote Required for Class Acceptance

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots for acceptance or rejection of the plan. Thus, class acceptance takes place only if at least two-thirds in amount and a majority in number of the holders of claims voting cast their ballots in favor of acceptance.

The Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds in amount of the interests of that class that actually cast ballots for acceptance or rejection of the plan. Thus, class acceptance takes place only if at least two-thirds in amount of the holders of interests voting cast their ballots in favor of acceptance.

### B.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Pursuant to the Solicitation Order, the Confirmation Hearing has been scheduled for **_____, at ____.m. Central Time**, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. In addition to considering confirmation of the Plan, the Bankruptcy Court will consider final approval of this Disclosure Statement at such hearing. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan and/or final approval of this Disclosure Statement must be made in writing and filed with the Bankruptcy Court on or before **5:00 p.m. Central Time on _____**, at the following address:

Office of the Clerk
United States Bankruptcy Court
Eldon B. Mahon U.S. Courthouse
501 W. 10th St.
Fort Worth, TX 76102-3643

In addition, any such objection must be served, together with proof of service, (a) on any parties who have filed notices of appearance and requests for notice in the Chapter 11 Cases and (b) upon the following parties on or before **5:00 p.m. Central Time on** _____:

Jeff P. Prostok
Lynda L. Lankford
Dylan T.F. Ross
**FORSHEY PROSTOK LLP**
777 Main Street, Suite 1550
Fort Worth, Texas 76102
jprostok@forsheyprostok.com
llankford@forsheyprostok.com
dross@forsheyprostok.com

United States Trustee
Attn: ~~Lisa L. Lambert~~Elizabeth Young, ~~Asst.
U.S. Trustee~~Trial Attorney
1100 Commerce Street, Room 976
Dallas, TX 75242
Email: Elizabeth.A.Young@usdoj.gov
~~Lisa.L.Lambert@usdoj.gov~~

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, THE BANKRUPTCY COURT WILL NOT CONSIDERED IT.

**C.      Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court must determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. As set forth in section 1129 of the Bankruptcy Code, these requirements are as follows:

1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

2.      The proponent of the Plan complied with the applicable provisions of the Bankruptcy Code.

3.      The Plan has been proposed in good faith and not by any means forbidden by law.

4.      Any payment made or promised by the Debtors, by the Plan proponent, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the Plan and incident to the case, has been approved by, or is subject to the approval of the Bankruptcy Court as reasonable.

5.      (a)      (i)      The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint plan with the Debtors, or a successor to the Debtors under the Plan; and

(ii)      the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(b)      the proponent of the Plan has disclosed the identity of any insider that will be employed or retained by the Liquidating Debtors, and the nature of any compensation for such insider.

6.      Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtors have approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

7.      With respect to each Impaired Class of Claims or Interests:

(a)      each holder of a Claim or Interest of such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date; or

(b)      if section 1111(b)(2) of the Bankruptcy Code applies to the Claims of such Class, the holder of a Claim of such Class will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such holder's Interest in the Estate's Interest in the property that secures such Claim.

8.      With respect to each Class of Claims or Interests:

(a)      such Class has accepted the Plan; or

(b)      such Class is not Impaired under the Plan.

9.      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that:

(a)      with respect to a Claim of a kind specified in section 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the Effective Date of the Plan, the holder of such Claim will receive on account of such Claim cash equal to the Allowed amount of such Claim;

(b)      with respect to a Class of Claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, each holder

of a Claim of such Class will receive:

   (i) if such Class has accepted the Plan, deferred cash payments of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim; or

   (ii) if such Class has not accepted the Plan, Cash on the Effective Date of the Plan equal to the Allowed amount of such Claim; and

  (c) with respect to a Claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such Claim will receive on account of such Claim regular installment payments in Cash:

 (i) of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim;

 (ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

 (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan (other than Cash payments made to a Class of Creditors under section 1122(b) of the Bankruptcy Code); and

  (d) with respect to a Secured Claim which would otherwise meet the description of an unsecured Claim of a Governmental Unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that Claim, the holder of that Claim will receive on account of that Claim, Cash payments, in the same manner and over the same period, as prescribed in 9(c) above.

 10. If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class.

 11. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

 12. All fees payable under 28 U.S.C. section 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payments of all such fees on the Effective Date of the Plan.

 13. The Plan provides for the continuation after its Effective Date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114, at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

14.     If the Debtors are required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the Debtors have paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

15.     In a case in which a Debtors is an individual and in which the holder of an Allowed unsecured Claim objects to the confirmation of the Plan:

(a)     the value, as of the Effective Date of the Plan, of the property to be distributed under the Plan on account of such Claim is not less than the amount of such Claim; or

(b)     the value of the property to be distributed under the Plan is not less than the projected disposable income of such Debtor (as defined in section 1325(b)(2) of the Bankruptcy Code) to be received during the five-year period beginning on the date that the first payment is due under the Plan, or during the period for which the Plan provides payments, whichever is longer.

16.     All transfers of property under the Plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

The Debtors believe that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all the requirements of chapter 11, and that the Plan is proposed in good faith.

The Debtors believe that holders of all Allowed Claims and Interests Impaired under the Plan will receive payments under the Plan having a present value, as of the Effective Date, not less than the amounts likely to be received if the Debtors were liquidated in a case under chapter 7 of the Bankruptcy Code. At the Confirmation Hearing, the Bankruptcy Court will determine whether holders of Allowed Claims or Allowed Interests would receive greater Distributions under the Plan than they would receive in a liquidation under chapter 7.

These facts and others demonstrating the confirmability of the Plan will be shown at the Confirmation Hearing.

**D.     Cramdown**

In the event that any Impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Plan proponent if, as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to that Class. A plan of reorganization "does not discriminate unfairly" within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for their claims or interests.

"Fair and equitable" has different meanings with respect to the treatment of secured

and unsecured claims. As set forth in section 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

1.   With respect to a class of secured claims, the plan provides:

(a)   (i)   that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii)   that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(b)   for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

(c)   the realization by such holders of the "indubitable equivalent" of such claims.

2.   With respect to a class of unsecured claims, the plan provides:

(a)   that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(b)   the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115 of the Bankruptcy Code, subject to the requirements of section 1129(a)(14) of the Bankruptcy Code.

3.   With respect to a class of interests, the plan provides:

(a)   that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest; or

(b)   that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

In the event that one or more Classes of impaired Claims or Interests reject the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and

equitable with respect to, and does not discriminate unfairly against, any rejecting impaired Class of Claims or Interests. For the reasons set forth above, the Debtors believe the Plan does not discriminate unfairly against, and is fair and equitable with respect to, each impaired Class of Claims or Interests.

## VIII. RISK FACTORS

The following is intended as a summary of certain risks associated with the Plan, but it is not exhaustive and must be supplemented by the analysis and evaluation made by each holder of a Claim or Interest of the Plan and this Disclosure Statement as a whole with such holder's own advisors.

### A.    Insufficient Acceptances

For the Plan to be, each impaired Class of Claims is given the opportunity to vote to accept or reject the Plan. With regard to such Impaired voting Classes, the Plan will be deemed accepted by a Class of Impaired Claims if the Plan is accepted by Claimants of such Class actually voting on the Plan who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the total Allowed Claims of the Class voted. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes. The Debtors reserve the right to request confirmation pursuant to the cramdown provisions in section 1129(b) of the Bankruptcy Code, which will allow confirmation of the Plan regardless of the fact that a particular Class of Claims has not accepted the Plan. However, there can be no assurance that any Impaired Class of Claims under the Plan will accept the Plan or that the Plan proponent would be able to use the cramdown provisions of the Bankruptcy Code for confirmation of the Plan.

### B.    Confirmation Risks

The following specific risks exist with respect to confirmation of the Plan:

1.   Any objection to confirmation of the Plan can either prevent confirmation of the Plan or delay such confirmation for a significant period of time.

2.   Since the Plan proponent may be seeking to obtain approval of the Plan over the rejection of one or more Impaired Classes of Claims, the cramdown process could delay confirmation.

### C.    Non-Occurrence of Conditions Precedent

Confirmation of the Plan and the occurrence of the Effective Date are subject to certain conditions precedent that may not occur.

### D.    Estimated Distributions under the Plan

In preparing the estimate of distributions under the Plan, the Estate's financial advisors have made certain estimates regarding projected cash on hand at confirmation.

The accuracy of such estimates is dependent upon several variables that are partially or wholly outside the Debtors' control or ability to predict with certainty, including (i) the aggregate amount of Allowed Claims, (ii) the amount, if any, for which certain Administrative Expenses are Allowed, (iii) the collectability of the Estate Accounts Receivable, and (iv) the costs of administering the Plan subsequent to its confirmation. Accordingly, while such estimations were prepared in good faith and with the best information available, actual distributions received by holders of Allowed Claims under the Plan may vary significantly from estimated distributions.

## IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    Continuation of the Chapter 11 Cases

The Debtors have sold substantially all of their assets and have ceased doing business. Accordingly, the Debtors believe that continuation of the Chapter 11 Cases is not a viable option.

### B.    Alternative Plan of Reorganization

Other parties-in-interest are free to file an alternative plan of reorganization at any time. At this time, the Plan is the only plan that has been proposed and filed in the Chapter 11 Cases. If the Plan is not confirmed, an alternative plan filed by another party-in-interest, or an amended Plan filed by the Debtors, might ultimately be confirmed by the Bankruptcy Court. However, the Debtors think it highly unlikely that an alternative plan could be proposed and confirmed that would compensate creditors for the increased costs of administration and delay that awaiting such a plan would create.

### C.    Chapter 7 Liquidation

If the Plan is not confirmed, the Chapter 11 Cases may potentially be converted to cases under chapter 7 of the Bankruptcy Code at a later date if such a request is made and granted by the Bankruptcy Court. As the Plan is liquidating plan and the Debtors have already sold substantially all of their assets prior to the filing of the Plan, and the remaining non-cash assets consist of collection on loans and pursuit of causes of action.  The currently pending legal actions are handled by professionals who have represented the Debtors since before the bankruptcy filing and thus have valuable institutional knowledge of the Debtors' businesses.  tThe Debtors believe converting to chapter 7 at this juncture would diminish the value to be realized by holders of Allowed Claims because of additional administrative expenses involved in the appointment of a chapter 7 trustee or trustees, attorneys, accountants, and other professionals to assist such trustee(s) in the case of chapter 7 proceedings. The chapter 7 trustee and professionals retained by the trustee would have to spend additional time to familiarize themselves with relevant information.  The Debtors also thus believe that liquidation underconverting the cases to chapter 7 cases could result in delay of distributions to holders of Allowed Claims as compared to the liquidation of the Estate proposed under the terms and provisions of the Plan.

Attached hereto as **Exhibit 2**, is a liquidation analysis. The Debtors have not

included the estimated recovery on the pending actions as the Debtors do not want defendants to be able to use any such information to potentially minimize their liability.

## X. CONCLUSION

The Debtors urge holders of Claims and Interests in Impaired Classes to vote to **ACCEPT** the Plan and to evidence such acceptance by returning their Ballots so that they will be received on or before **5:00 p.m., Central Time, on _____**.

*[The remainder of this page has been left intentionally blank.]*

Dated:   ~~April 18~~May ___, 2022.

Respectfully submitted,

**FLEXIBLE FUNDING LTD. LIABILITY CO.**


By: _____
    Steve Capper
    Managing Member


By: _____
    Paul DeLuca
    Managing Member




**INSTAPAY FLEXIBLE, LLC**


By: _____
    Steve Capper
    Manager


By: _____
    Paul DeLuca
    Manager

Jeff P. Prostok
State Bar No. 16352500
Lynda L. Lankford
State Bar No. 11935020
Dylan T.F. Ross
State Bar No. 24104435
**FORSHEY PROSTOK LLP**
777 Main Street, Suite 1550
Fort Worth, Texas 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
llankford@forsheyprostok.com
dross@forsheyprostok.com

**ATTORNEYS FOR DEBTORS
AND DEBTORS-IN-POSSESSION**

# EXHIBIT 1

# PLAN

# **EXHIBIT 2**

# **LIQUIDATION ANALYSIS**

**Total Estate**
*Liquidation Analysis\**

**Cash Available + Expected Recoveries**

| | |
|---|---:|
| Net Cash On Hand:  4/29/2022 | $8,156,361 |

*Recovered/Paid Post-4/29/22*

| | |
|---|---:|
| Less: Estimated Actual Operating Expenses Post 4/29/22 | ($136,135) |
| Less: Estimated Bison/Medalist Interest Expense | ($173,000) |
| **Subtotal** | **($309,135)** |

*Anticipated cash to be recovered  pursuant to the terms of sale to eCapital*

| | |
|---|---:|
| Instapay Holdback | $1,397,964 |
| Education Works | $1,290,160 |
| Instapay Overadvances | $495,127 |
| Flexible Term Loans | $394,354 |
| **Subtotal** | **$3,577,606** |

| | |
|---|---:|
| **Total Cash Available + Cash to be Recovered Related to Sales to e-Capital** | **$11,424,832** |

**Additional Assets Left with Estate**

| | |
|---|---:|
| Potential recoveries on customer accounts remaining with the estate | $10,667,156 |
| Plus: iLink Term Loan Note (2-Year Note) | $708,333 |
| Temps Plus Recovery (Note) | $190,000 |

| | |
|---|---:|
| **Total Projected Collections** | **$11,565,489** |

| | |
|---|---:|
| **Net Value in Estate** | **$22,990,321** |

**Administrative Expenses**

| | |
|---|---:|
| Estimated Accrued & Unpaid Professional Fees | |
| Prostok May Estimate | ($370,000) |
| Ward & Smith - GCLC - May Actual | ($293,895) |
| Candlewood - May Actual | ($207,000) |
| Other Legal & Professionals - Future | ($300,000) |
| | |
| Estimated Budget for Ongoing Operations | ($250,000) |
| Plus: Wind Down Trustee Estimate | ($250,000) |
| Estimated UST Fees | ($300,000) |
| One Embarcardero (admin rent) | ($16,440) |
| **Total Administrative Expenses** | **($1,987,335)** |

| | |
|---|---:|
| **Projected Priority** | **($60,333)** |

| | |
|---|---:|
| **Net Value Remaining** | **$20,942,653** |

| | |
|---|---:|
| Secured Sub Debt - Medalist Partners | ($15,700,000) |
| Secured Sub Debt - Bison | ($2,000,000) |
| **Total** | **($17,700,000)** |

| | |
|---|---:|
| **Projected Net Value Remaining for Unsecured Creditors** | **$3,242,653** |

**Pursuit of Claims and Causes of Action**

**The Debtors are currently pursuing additional claims and causes of action and, if successful, recoveries from the lawsuits could result in a significant increase of funds available for distribution to creditors.**

\* These projections are based on information available to the Debtors as of the date of this Disclosure Statement.  Actual results may differ,

and such differences may be material, especially with respect to the collection of accounts and the pursuit of other claims and causes of action.